UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA,

Dkt. No. 17-CR-289

      v.

JORDAN COHAN,

              Defendant.

-----------------------------------------------------X


### SENTENCING MEMORANDUM


Steven Brill, Esq.
Sullivan & Brill
115 Broadway, 17th Floor
New York, New York 10006
Telephone: (212) 566-1000
E-mail: steven.brill@sullivanbrill.com

Edward V. Sapone, Esq.
Chase S. Ruddy, Esq.
Sapone & Petrillo, LLP
One Penn Plaza, Suite 5315
New York, New York 10119
Telephone: (212) 349-9000
E-mail: ed@saponepetrillo.com

## <u>TABLE OF CONTENTS</u>

**Page**

I.  Introduction ................................................................................................ 1

II. Jordan's History & Characteristics and the Nature &
Circumstances of the Offense (§3553(a)(1)) ................................................4

    *a.*   *Jordan's History & Characteristics* ........................................4

    *b.*   *Nature and Circumstances of the Offense* ........................................20

III. Remaining Factors of 18 U.S.C. §3553(a) ..........................................24

    *a.*   *The Need for the Sentence Imposed to Reflect the Seriousness
of the Offense, to Promote Respect for the Law, to Provide
Just Punishment for the Offense, and to Avoid Unwarranted
Sentence Disparities* ........................................24

    *b.*   *The Requested Sentence Can Provide Adequate Deterrence,
and Protect the Public from Future Offenses by Jordan* ................30

    *c.*   *The Requested Sentence is the Safest Option for Jordan* ................36

IV. Conclusion ........................................39

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*United States v. Bohannon*,
   476 F.3d 1246 (11th Cir. 2007) ...................................................29

*United States v. Brucker*,
   646 F.3d 1012 (7th Cir. 2011) ....................................................29

*United States v. Davey*,
   550 F.3d 653 (7th Cir. 2008) ......................................................28

*United States v. Hensley*,
   574 F.3d 384 (7th Cir. 2009) ......................................................29

*United States v. Hughes*,
   632 F.3d 956 (6th Cir. 2011) ......................................................29

*United States v. Justin Daniel Osborne*,
   (09-CR-14033, S.D.Fla.) .............................................................29

*United States v. Nagel*,
   559 F.3d 756 (7th Cir. 2009) ......................................................29

*United States v. Shill,*
   (13-30008, 9th Cir.) ....................................................................29

**Statutes**

18 U.S.C. §§2252A ...................................................................................1

18 U.S.C. §2422(b) ...........................................................................1, 28, 29

18 U.S.C. §3553(a) ............................................................................. *passim*

**Other Authorities**

Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity:*
   *An Analysis of Recent Research* (1999) ...............................................30

BJS, *Sexual Victimization in Prisons and Jails Reported by Inmates*, 2008-09 (Jan. 2010) (A.
   Beck et al.), available at http://bjs.ojp.usdoj.gov/content/pub/pdf/svpjri0809.pdf ..............36

David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33Criminology 587 (1995) ............................................30

Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) ..............................................31

Federal Bureau of Prisons, Sex Offenders, available at https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp .....................................37

Helen Eigenberg, *Correctional Officers' Definition of Rape in Male Prisons*, 28 J.CRIM.JUST. 435, 442 (2000)) ............................................37

Katherine Robb, *What We Don't Know Might Hurt Us: Subjective Knowledge and the Eighth Amendment's Deliberate Indifference Standard for Sexual Abuse in Prisons*, 65 N.Y.U.ANN.SURV.AM.L.705, 719 nn.69 & 70 (2010) ...................................37

Michael Pinard, *Collateral Consequences of Criminal Convictions: Confronting Issues of Race and Dignity*, 85 N.Y.U. L. Rev. 457, 459 (2010)........................27

Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006)....................................30

Michelle Alexander, *The New Jim Crow*, 142 (2010) .................................................27

Peter L. Nacci & Thomas R. Kane, *Sex and Sexual Aggression in Federal Prisons: Inmate Involvement and Employee Impact*, 48 FED.PROBATION 46, 48 (1984) ............................37

*Recidivism and the 'First Offender": A component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate*, United States Sentencing Commission, May 2004................................................32

Steven N. Durlauf & Daniel S. Negin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y 13, 37 (2011) ....................................30

U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004)........................................31

U.S. Sent'g Comm'n, Sourcebook of Federal Sentencing Statistics for Fiscal Year 2017 ..........28

Valerie Wright, Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* 8 (2010), available at http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf................................30

## I.      Introduction

We offer this memorandum for Defendant Jordan Cohen to assist the Court to arrive at the appropriate sentence which we strongly believe is a term of incarceration of 10 years followed by supervised release with conditions that will foster Jordan's successful reassimilation into the community.

Jordan accepted responsibility on August 20, 2018, to counts one and four of the indictment (17-CR-289), which charge him with attempted coercion and enticement of a minor to engage in illegal sexual activity, in violation of 18 U.S.C. §2422(b), and possession of child pornography, in violation of 18 U.S.C. §§2252A(a)(5)(B) &(b)(2).

The advisory Guidelines range is 210 to 262 months of imprisonment. The statutory mandatory minimum term of incarceration is 10 years. Probation recommends a bottom-of-the-Guidelines sentence of 210 months. While we, of course, acknowledge the serious nature of these crimes, we believe that the §3553(a) factors and the parsimony clause support the requested 10-year sentence.

No matter what the Court decides, Jordan will spend the next many years of his life in prison where he will participate in the limited opportunities offered by the BOP.  Truth be told, however, because he is a gay man who committed these kinds of offenses, his incarceration will serve as retribution more than anything else. This has already been borne out, as Jordan has thrice been attacked and has been locked in the SHU for his protection.

The fact that the man with whom Jordan communicated, and who texted that he would engage his son in sexual activity, was really a federal agent playing a role is a fact that does nothing to lessen Jordan's regret; nor does the fact that Jordan came to possess the number of child porn images in one purchase for $40 do anything to lessen his shame.  And while he is at

times still tortured by these choices, he is also grateful that he was arrested and prosecuted.  As difficult as this case has been for Jordan and his family, they recognize that he is not a victim, and that this case helped to save his life.

Jordan's history of abuse, pain and depression had culminated in his downward spiral into a brief, dark time in his life during which he committed these offenses.  Jordan had been molested as a child. His childhood home was filled with his parents' vicious fighting and prolonged nasty divorce. He was then shuffled between each of his mother's and his father's dysfunctional homes. His mother and stepfather had forced him into *conversion therapy* to fix him from being gay. He failed at his emotional relationships. Jordan was an emotional wreck and was drinking to self-medicate. And while in this dark abyss, Jordan's sexuality devolved into an extreme dysfunction.

Fortunately, his apprehension rescued him.  Since then, Jordan has repaired a seemingly irreparable relationship with his parents and stepfather. He has spent more than 60 hours with two mental health professionals retained by counsel. Those meetings have helped him understand a lot about himself and create a life plan that Jordan will implement when released from custody. And he has been stabilized on a medication that controls his anxiety. In sum, with the support of his family and professionals, Jordan has made a 180-degree turn for the better, which he intends to maintain in prison and then at liberty.

We ask the Court to consider not only the crimes for which Jordan has accepted responsibility, but the whole person whom it will sentence, and find that Jordan's extraordinary history and characteristics (18 U.S.C. §3553(a)(1)) and the significant progress he has already made towards rehabilitation during his more than two years in custody, warrant a non-Guidelines sentence that will return him to his family and start him on his life plan as soon as possible.

We wish to highlight the following:

(1) **Lifelong History of Trauma** – Jordan had been a victim of repeated trauma throughout his life, which had instilled in him feelings of worthlessness, self-hatred and rejection, and had contributed to the instant offense; among the traumas Jordan suffered was the rejection by his family when he admitted to being gay, and his forced enrollment in *conversion therapy*, now illegal in most states, to "fix" him;

(2) **Victim of Sexual Assault** – Part of Jordan's traumatic history includes being sexually abused when he was seven years of age, an experience which hindered Jordan's ability to form normal sexual relationships into adulthood;

(3) **First Time Offender** – Jordan is a 33-year-old first-time offender with zero criminal history points who has accepted full responsibility and has been a model inmate since his arrest and detention two years ago; social science research and evaluations performed by Dr. Krueger and Dr. Simone Gordon support the conclusion that Jordan presents a very low risk of recidivism;

(4) **Self-Rehabilitation** – In the more than two years that Jordan has been incarcerated, he has demonstrated the capacity for self-realization and the need to confront his past and to make a positive change. He has benefitted greatly from opening up about his traumatic history and has expressed a strong desire to engage in continued treatment, including participating in whatever sex offender treatment and mental health programs become available;

(5) **Positive Life Plan** – Jordan plans to utilize his incarceration to finish his PhD, and wants to harness his passion for helping people learn to assist other inmates, and upon his release, to help previously-incarcerated people pursue educational opportunities. He also has a plan to continue treatment, find meaningful employment, and continue to repair familial relationships and his overall growth; and

(6) **Safety** – Jordan faces above-average risks of beatings and sexual assault during his time in prison as a gay man, a victim of prior sexual assault, and as a sex offender; he already has been attacked and threatened three times, requiring him to seek protective custody in the Special Housing Unit.

## II.   Jordan's History & Characteristics and the
## Nature & Circumstances of the Offense (§ 3553(a)(1))

a.   *Jordan's History & Characteristics[1]*

Jordan is 33 years of age. He is an extremely intelligent young man whose life, tragically, has been marked by a long series of traumas that have impacted his development in crucial areas of his life.

Jordan's parents each grew up in dysfunctional households, something that no doubt informed the household they would form together, and into which Jordan was born and raised. Jordan's mother Barbara grew up with a verbally and physically abusive father. Her mother didn't believe she could care for two children on her own, so she remained in a toxic marriage. Barbara reports a life-long history of depression, and suffered her first "Major Depressive Episode" at age 18. (*See* Exhibit A, p. 5). She also suffered from an eating disorder which led to a body dysmorphic disorder. (*See* Exhibit A, p. 5). Instead of seeking therapy, however, Barbara hid her depression from her family; she continues to downplay it as "situational." (Exhibit A, p. 5). She eventually went to an "eating program" to try to control her weight.

Jordan's father, Kenny, also came from a dysfunctional family. Kenny's father abandoned the family for another woman when Kenny was 15 years old. Kenny had no male role model growing up, and his mother was left to raise three children alone, including Kenny's mentally ill younger brother, who was later diagnosed with schizo-affective disorder. Kenny's mother relied principally on welfare and social services to support herself and her children.

Kenny and Barbara met shortly after she finished the eating program, at a time when Barbara was "down in the dumps." (Exhibit A, p. 5). She was desperate to get out of her parents' house, and within a month of meeting, she had moved into Kenny's apartment in Yonkers, New

---

[1] Much of Jordan's history is drawn from the report of Simone Gordon, D.S.W., L.C.S.W., who spent more than 60 hours interviewing Jordan over the past two years at the MDC Brooklyn. Her report is attached as Exhibit A.

York. Not long after, while on a trip to California, Barbara delivered an ultimatum to Kenny: either they marry or she was moving out.

They tied the knot. The marriage, however, was hardly built on a foundation of love and mutual respect. They moved to Cliffside Park, New Jersey, because Kenny secured a job offer as a recruiter at a truck driving school. At that time, Barbara was teaching under-prepared students to get them ready for college. The lack of money, however, was always a problem. Kenny kept losing jobs and creating financial crises for the couple. Barbara explains: "Sometimes we didn't have enough money for food and we couldn't afford our mortgage payments." (Exhibit A, p. 6). As a result, there was no stability in their marriage.

Kenny was reluctant to have children, but in August 1983, Barbara gave birth to the couple's first child, Jordan's older brother, Matthew. Following Matthew's birth, Barbara became a stay-at-home mother. This did nothing to remedy the family's existing financial problems, and they moved frequently until Barbara became pregnant with Jordan, and the family settled in Yardley, Pennsylvania.

Kenny and Barbara were fighting frequently while she was pregnant with Jordan. Barbara recounts one particular fight, in her ninth month of pregnancy with Jordan, that could have caused a miscarriage and that provides a window into the family dynamic just as Jordan was born: "[H]e pushed me. Fortunately I fell back onto the couch. I never trusted him again after that. You could say I stopped loving him." (Exhibit A, p. 6). Like her own mother, Barbara did not think she could raise two children on her own, so, at the time, she elected to stay in the toxic marriage with Kenny for several more years.

Jordan was born in September 1985. He was ill all the time. Jordan suffered from chronic ear infections and irritable bowel syndrome. He was in constant pain. Because of this, he was

never able to experience what it was like to feel soothed, and as a result had no ability to soothe himself as he got older. Barbara was unable to bond with Jordan, and was depressed and anxious because of her perceived inability to calm her child. Barbara, who had a history of poor self-esteem and depression was overwhelmed, and transferred her anxiety to Jordan. This would serve as a precursor to the rest of Jordan's life.

Because Kenny could not hold down a job, and the family was constantly in financial turmoil, Barbara returned to work when Matthew was three and Jordan was two years of age. Matthew and Jordan were placed in pre-kindergarten Mondays through Fridays. Jordan proved to be very bright as a young child, and when he was five he tested in the very superior range of intellectual ability. As a result, he started first grade a year early, and within months was placed in a program for "gifted" students. Despite his superior intelligence, Jordan remained emotionally immature.

At home, Jordan's world was constantly under attack. Jordan was highly sensitive, and acutely perceived his parents' problems. He came to realize at an early age that his parents didn't love each other; their fighting was incessant. And Jordan witnessed the calls to, and visits from, the police. So did the neighbors. Jordan was embarrassed to bring friends home, as they would hear the screaming and fighting from all corners of the house. Jordan recalls feeling helpless because there was nothing he could do to.

Jordan became obsessed with excelling in school as a way of gaining his parents' acceptance. He was powerless to stop their fighting, so he channeled all of his energy into his academic performance. He became a star student at an early age, but underneath that façade was a frightened, lonely, traumatized little boy who was riddled with self-doubt, anxiety and depression, and who never felt comfortable in his own skin.

When Jordan was in the fourth grade, his parents finally decided to divorce. Both Barbara and Kenny acknowledge that the years leading to their divorce were dreadful for Jordan. On the advice of his attorney, Kenny refused to leave the home until the divorce was finalized. The spite in the home was palpable; the tension, unbearable. And the fighting was relentless. Jordan did everything he could to escape. One source of reprieve was fleeing to summer camp. However, camp would expose Jordan to an entirely different source of trauma that would have affect the rest of his life.

When Jordan was seven years old, he attended his first sleep away camp at Camp Briarwood, located in Pennsylvania. That summer, Jordan was sexually molested by a male camp counselor. Jordan recalls experiencing mixed feelings of dread and excitement. He did not fully appreciate that what had happened was sexual abuse. In one sense, he felt a distorted sense of comfort and that he was "special," while also experiencing a sense of fear and shame.

According to Dr. Gordon: "This early trauma set the stage for Jordan's premature exposure to sexual activities and to being an erotic object for someone else's needs. Tragically, Jordan misinterpreted this experience as 'being loved' rather than being used." (Exhibit A, p. 11).

While Jordan may not have fully realized what had happened to him, following the abuse he began to display a number of behaviors common among victims of sexual abuse, including anxiety, affect dysregulation, self-destructive behavior and self-mutilation. (*See* Exhibit A, pp. 11-12). Also, like many survivors of childhood sexual abuse, while the effects of the abuse are seen throughout Jordan's life, out of necessity, he repressed the memories of the actual abuse until they began to resurface through the process of reliving the events of that time period while talking with Simone Gordon. (*See* Exhibit A, p. 10, n.8).

Things did not improve when Jordan returned home. He was thrust, once again, into the trauma of his parents' divorce. He felt lonely and "different" from the other kids in his class. He recalls feeling ashamed and embarrassed when one of his teachers asked him, following the divorce, whether his report card should get sent to his mom's house or his dad's. Making matters worse, Barbara and Kenny worked out a complicated custody arrangement whereby Jordan never felt "at home" at either parent's house.

When Jordan was at his father's house, he recalls the home being dirty, and that his father was hardly ever there. For a time, Kenny hired a "housekeeper" who appeared to have helped watch Jordan and his brother and to have kept the house in order. But more often than not, the kids were left alone and there was no structure.

Barbara's house was the opposite: it was like an army camp. Once the divorce was finalized, Barbara began dating a man named Paul Averill. Paul was a six-year veteran of the U.S. Air Force who grew up in a "fundamentalist" Christian and military family that misunderstood what a Christian household ought to be. Love, kindness and forgiveness gave way to rules, regulations and punishments. And, Paul, as the head of the household, had a very strict view of how Barbara's boys—and especially Jordan—were going to conduct themselves.

At first, Jordan appreciated that Paul, unlike his father, was always around. He helped Jordan and Matthew with school projects and erected a basketball hoop. Barbara, in turn, viewed Paul as stable, financially secure, and a strong male role model. However, once she and Paul married, everything changed.

Paul began to push his ultra-conservative, unforgiving ideology on the boys. For example, the boys, who had, until that point, been raised liberal and Jewish, were now forced to live under the weight of Paul's extremely conservative fundamentalist Christian viewpoints that

were anything but Christ-like. Matthew described Paul as an "authoritarian" who was bigoted and unreasonable. Jordan recalls Paul demanding that Jordan be a "man."

The result was that Jordan was unhappy at his mother's house with Paul, and unhappy at his father's house. With no place that he truly felt happy, Jordan sought refuge at the house of his childhood friend, Scott. Jordan grew to feel a connection with Scott, who was being raised by a single father after Scott's mother died when he was baby. Jordan and Scott sought solace and comfort from each other.

Jordan and Scott came to share a unique emotional connection. Sadly, following the sexual abuse Jordan suffered at summer camp when he was seven, Jordan came to associate the comfort and "love" he experienced with Scott with the sexualized "love" he had experienced at camp. Before long, the boys began to engage in sexual play and mutual stimulation, eventually experimenting with oral and anal sex. When they each turned 10 years of age their relationship ended, in part because they were forced to confront whether their relationship meant that they were "gay," which was something that neither boy was brave enough to accept at that time.

As Jordan entered adolescence, he continued to struggle with his identity. These struggles were compounded by what Jordan perceived as a conflict between who he was and who his parents (and Paul) wanted him to be.

To his father's chagrin, Jordan was not interested in sports; to Paul's, Jordan was not interested in camping or hiking. Jordan also continued to be caught in the middle of the irreconcilable religious and value differences between his biological parents' families and Paul's. Jordan felt like he could never be himself, and that he always had to take on a "role". (*See* Exhibit A, p. 13).

This drew Jordan to the theatre, where, when he was on stage, he could take on any role he wanted. For the first time in his life, Jordan felt that he had found an outlet through which he could express himself. His participation in the theatre gave him a sense of purpose and belonging; it helped to ameliorate his constant feeling that he was different and his profound loneliness. And, he was good at it.

Jordan was awarded the Best Actor award for his performance in Lucky Stiff by the Performing Arts Alliance of Southeastern Pennsylvania during the 1997-98 school year. The following year, Jordan won the award for Theatre Excellence from the Performing Arts Alliance of Southeastern Pennsylvania for his performances in Winning Season and Damn Yankees. Jordan's mother helped him to get a scholarship to attend a theatre camp in upstate New York, where, for the first time, Jordan encountered a group of boys who were openly gay.

Jordan was still struggling with internalized homophobia, and the experience confirmed for Jordan that he was not ready to come out himself; he was still struggling to come to terms with his sexuality, and he was afraid of how his family and friends might react to his being gay. As it turned out, his fears were real.

When Jordan was 16 years old, his brother Matthew discovered a cache of gay pornography on the family computer. Matthew, who believed that his mother favored Jordan, often looked for ways to upset the tenuous equilibrium in the house. So he took the opportunity to reveal the pornography to his mother and Paul instead of talking to Jordan about it.

Jordan vividly recalls receiving a phone call from his mother ordering him to "come home right away." (Exhibit A, p. 18). When he arrived home, his mother and Paul were waiting to confront him. He remembers the chilling effect of his mother saying: "we are not going to let you be gay." (Exhibit A, p. 18). Paul even threatened to leave Barbara over Jordan's being gay.

10

He made it clear that he believed that homosexuality was a sin, and that he "didn't need this." (Exhibit A, p. 18). He told Jordan that he couldn't bring any of his gay friends over to the house, or have any "gay sex" under his roof.

Jordan was irreparably damaged by his mother and Paul's reaction to his sexuality, and his ongoing identity struggles. He felt totally unsupported by his parents while he was in high school, and was terrified that Paul would make good on his threat to leave his mother, and that he would be the cause of his mother's second failed marriage. Barbara's best friend, Iris Gold recalls: "every child needs a village, and Jordan had no-one." (Exhibit A, p. 18; Exhibit B).

Following the gay porn incident, Paul and Barbara doubled down on their efforts to turn Jordan into a "man." As part of this effort, they sent Jordan to a "conversion/reparation" therapist, a Rabbi Rosenberg. Rosenberg was the director of "Project Jonah" in New Jersey, a Jewish organization that promoted "conversion" therapy for adolescents and others "struggling" with sexual orientation issues. The focus of Rabbi Rosenberg's therapy was to dissuade Jordan from embracing a "gay" lifestyle. Jordan went to treat with Rabbi Rosenberg on a weekly basis for a year and a half before leaving for college. According to Jordan, "[h]e told me that homosexuality was unnatural and against nature. It made me depressed. I hated being alive." (Exhibit A, p. 19).

The therapy with Rabbi Rosenberg was extremely damaging to Jordan's already tenuous self-esteem; he internalized the message that "he was aberrant and no good." (Exhibit A, p. 19). This attitude was reinforced at home, where Jordan felt rejected by his parents, Paul and his brother. Jordan was never permitted to love himself. He had difficulty sleeping and suffered from anxiety. He reported that "life was torture," for him during those two years. Further, because Jordan was prohibited from having any gay friends, or participating in any gay relationships,

Jordan's social and psychological development remained frozen, which would continue to affect his ability to enter into any meaningful relationships in the years to come.

The only concerns over which Jordan felt he had any control were his school work and his life in the theatre. He fell into roles as a means of coping and survival. The theatre provided Jordan with the only place where he could be anyone he wanted to be. Fantasy and reality would often blur for Jordan to the point that the characters became "real" for him. The fantasy gave Jordan the "distancing" necessary to survive the traumatic events and intolerable pain of his childhood and adolescence.

Jordan continued to excel academically and in the theatre. He was a national merit scholar, a member of the National Honor Society, and received several awards during his distinguished high school academic career. He eventually graduated number one in his class from Pennbury High School. He also won numerous accolades for his acting, including the Bucks County Playhouse Critic's Award for excellence in acting.

Desperately wanting to leave home after high school, Jordan applied, and was accepted to Northwestern University in Evanston, Illinois. There, Jordan majored in Communications with a concentration in Theatre. He spent many hours a week at the theatre and began to find some happiness.

On a trip home in the summer after his freshman year, Jordan officially came out to his mother and Paul. As might be expected, they did not react well. Paul told Jordan "I don't want any gay person in this house." (Exhibit A, p. 21). They treated Jordan's identity like a dirty secret; no one could know that he was gay. As a result, Jordan did not feel welcome in his own home. He recalls thinking at the time that he "would be better off dead." (Exhibit A, p. 21).

After he came out, the environment was so toxic at his mother and Paul's house that Jordan was forced to stay at a friend's home. And following that summer, Jordan never again returned home for summer vacation from school.

When he returned to school that fall, Jordan began suffering anxiety attacks about not being "good enough." (Exhibit A, p. 21). These feelings were further compounded by Jordan's anxiety and disappointment over his inability to find a long-term significant relationship during his college years.

So Jordan dove headfirst into work:

- During the school year, Jordan worked as a research assistant in the performance studies department from 2003-2007;

- In the summer of 2005, Jordan worked as an artistic intern at the Looking Glass Theatre in Chicago;

- In the summer of 2006, Jordan worked as an Acting Apprentice at the Williamstown Theatre Festival, during which he spent 10 weeks in Massachusetts; and

- He also worked as a waited at various restaurants in, and around, Evanston.

Jordan's heart was set on working as a theatre actor after graduating from college. In his senior year, he was selected to showcase at the 2nd Stage Theatre on 43rd Street and 8th Avenue in New York. He hoped to secure a job offer from the audition. It was the biggest moment in his fledgling professional life. Unfortunately, he bombed. He suffered from a major case of performance anxiety, which, coupled with selecting the wrong part, led to him being the only one in his class not to be offered any interviews or auditions. He was devastated. Until that moment,

acting had always been his life raft. After not receiving any offers, he felt like he had lost even that. He was left anxious and depressed.

Jordan was still able to graduate *magna cum laude* from Northwestern that spring with a 3.85 GPA, and a Bachelors of Science degree in Communications and Theatre. Despite failing at his earlier audition, Jordan still decided to move to New York to pursue acting. Once he arrived in New York, however, despite his early successes as an actor, he discovered just how competitive it was to try and make it as an "actor" in the City. He kept going on auditions but never got chosen for a part. He became increasingly anxious, and eventually sunk into a deep depression.

He took a job as a waiter at Café Fiorello, and, with a group of friends, started the Vagabond Theatre Ensemble; he was the Founder and Marketing Chair for the group. They performed a few productions over the following three years, but could not raise enough money for it to remain viable. In February 2008, Jordan gave up on his dream of an acting career.

From 2008-2009, he went to work as a development intern for Do Something, a non-profit company which provided social entrepreneurship training to youths to enable them to work in their communities. After that, he worked as a development intern for another non-profit, Echoing Green, but didn't connect with the work. And for the next 18 months, Jordan worked as a waiter at two restaurants, Marseille and Belleville.

During this time, Jordan also worked as a private tutor for Big Apple Tutoring Company. Subsequently, he worked from 2010-2015 for another company, AccuTutor. During his time as a tutor, Jordan worked with over 30 children, ranging from kindergarten to 12th grade. He found that he liked teaching, and he was good at it.

When Jordan consulted a career counselor, they suggested that he consider returning to school to pursue a graduate degree where he would have an opportunity to work with students. Jordan began researching and applying to different PhD programs. After applying to six different programs, Jordan was accepted at the Graduate Center at the City University of New York (CUNY).

Once again, he fully immersed himself in non-stop work:

- Jordan was awarded the Chancellors Fellowship, which gave him an annual stipend and covered his tuition;

- As a fellowship recipient, Jordan's responsibilities included working for Professor James Wilson, editor of the Journal of American Drama and Theatre (2011-12), serving as a graduate teaching fellow at Hunter College (2012-15), and as a writing fellow (2015-16);

- Jordan worked as an external researcher at the Drama Desk Organization from 2011-2015;

- As a graduate teaching fellow, Jordan was responsible for teaching weekly seminars for 15-30 students; and

- Jordan continued to tutor until 2015.

When Jordan's Chancellors Fellowship ended, he applied for a second fellowship. From 2016-2017, Jordan became a Communication Fellow at the Schwartz Communication Institute at Baruch College. Jordan also found paid employment as an adjunct professor at Marymount College.

Jordan was well-respected as a student, teacher, and colleague during the time spent working towards his PhD.

According to Meechal Hoffman, who worked with Jordan at Baruch College: "Jordan was a highly valued member of our team. He was a skilled and effective teacher, a supportive and thoughtful colleague, and a delightful presence. […] Jordan always stood apart as a teacher devoted to improving his students' learning and lives." (Exhibit C).

These sentiments are echoed by Jean Graham-Jones, one of the professors in the PhD program at CUNY's Graduate Center: "Jordan […] excelled as a student, as a teacher, and as a colleague. […] He was among the most engaged students in my classes, always prepared and typically thinking beyond the requirements of the course towards the larger issues encountered in certain art forms […]. He was also a generous colleague, always ready to support his classmates at various stages in the program." (Exhibit D).

Dongshin Chang, with whom Jordan collaborated on a scholarly article, similarly shares: "Jordan demonstrated his professional work ethics and dedication to student learning, contributing much to the success of my courses and my students' education. […] Jordan's help proved to be instrumental for my students' success. […] I found him dependable and trustworthy, a great colleague." (Exhibit E).

And according to Jordan's mentor, James Wilson: "Jordan cared deeply about bringing out the best in his students, and he was resourceful and creative in involving his students in the course material. For him teaching was not merely a job or line on his academic cv but a commitment to ensuring that CUNY's racially and ethnically diverse student population would be prepared to face daunting professional and social challenges after graduation. Jordan's compassion for and dedication to the larger community are two of his most admirable qualities." (Exhibit F).

Despite the successful façade he put up to the world, Jordan continued to experience anxiety and depression throughout graduate school. In October 2011, Jordan experienced his first major panic attack. Afterwards, he went to the counseling center, where he was evaluated for his ongoing panic attacks. He was referred to Dr. Gavin Friedman for a psychiatric evaluation, during which he reported feelings of "worthlessness, helplessness, hopelessness and sadness." (Exhibit A, p. 24). He also expressed that he did not feel on par with the other students in his class, and questioned whether he should be in graduate school.

Dr. Friedman prescribed anti-depressants, and diagnosed Jordan with Dysthemic Disorder, problems with his primary support group, and educational problems. Following Jordan's fifth appointment, the case was closed. Jordan suffered another major panic attack in 2013, while studying for the first part of his qualifying exams.

Jordan continued on antidepressants under the care of several other doctors from 2011-2017, however, he did not follow through with recommendations that he see a psychotherapist in addition to medication. Simone Gordon attributes this to a likely distrust for therapy following Jordan's previous experience with reparation/conversion therapy. (Exhibit A, p. 37). The result was that, while medicated, Jordan never was able to address the deep-seated underlying sources of his anxiety and depression, and they continued to fester.

In 2016, Jordan met Jack. Jack was an actor, living in Chicago when he and Jordan met. They liked each other instantly, and not long after Jack moved to New York for a part in a play. He moved into Jordan's apartment, and Jordan finally believed that he had found a real love relationship. Jack's play ended up going on a national tour, and while Jack was out on tour, he met someone else. Jordan didn't see the break-up coming, and was completely shattered. He

gave up hope of ever having anything good in his life and after yet another rejection, he believed he was a complete failure. He recalls feeling "dead" and deeply depressed. (Exhibit A, p. 27).

According to Simone Gordon, while break-ups are hard for anyone, for Jordan it was even more difficult because it was the first time in his life that he had come anywhere close to having a "real relationship." (Exhibit A, p. 27). Despite being 30 years old, Jordan was still functioning as a traumatized 16-year-old who had been deprived of learning the necessary skills to develop and cultivate relationships with his peers.

Jordan kept replaying, in his head, all of the negative messages from his life. And he constantly heard the negative voices: Paul's voice. His mother's voice. And Rabbi Rosenberg's voice. "I was that dirty thing that had to be hidden, I was that aberrant pervert." (Exhibit A, p. 27). These internalized voices were deafening in Jordan's deep-seated depression. He generally couldn't get out of bed, and when he did get out of bed, he struggled through his days like an automaton.

It was in this environment that Jordan was forced to study for his qualifying exams for his PhD. Jordan was terrified that he would fail, and having just failed in the most important relationship in his life, Jordan was even more anxious about failing in his professional life. In Jordan's words, he started to become "unhinged." (Exhibit A, p. 28). In an attempt to feel better, he sought to self-medicate. He was drinking heavily, consuming alcohol to the point of intoxication several times each week. He also used the internet in an attempt to self-medicate, using porn and anonymous sexual contact to fill the void without the danger of actually having to expose himself to meaningful emotional contact with anyone. His mental state continued to deteriorate, until, having reached the darkest point in his life, Jordan began engaging in the instant offense conduct.

While Jordan's life is characterized by the many struggles and traumas he has had to endure, he has also contributed much good to his community. The many letters to the Court attest to Jordan's strengths, including his work ethic, and the contributions he made to his students, friends, and those less fortunate than himself. All of the letters speak to Jordan's basic goodness and caring.

According to James Wilson: "Jordan Cohen is a kind, smart, socially conscious, and empathetic individual […]." (Exhibit F).

Shane Breaux describes Jordan as "a very generous, strong person I feel fortunate to have in my life." (Exhibit G).

Erin Rachel Kaplan similarly depicts Jordan as "a down-to-earth, humble person, and a great friend." (Exhibit H). She goes on to describe Jordan as a "kind, funny, and compassionate individual who [i]s incredibly smart, talented, and deeply interested in everything around him." (Exhibit H).

This is further echoed by Daniella Gold: "I have always known Jordan to [] be a very caring, compassionate, and responsible person. […] Jordan is one of the smartest, kindest, most generous people I know. […] Jordan lives to make others happy." (Exhibit I).

Jordan's friend, Monica Isomura, describes Jordan as a wonderful friend to her throughout their fifteen-year-long friendship: "He is an extraordinarily generous, compassionate, and loving person, which he has demonstrated time and time again through the emotional support he has shown me during the best and worst times of my life." (Exhibit J).

This sentiment is shared by Jonathan Zimmerman: "I came to appreciate Jordan as the rarest kind of friend and ally: one whose support is both generous and unconditional." (Exhibit K).

19

Finally, Jordan's mother, Barbara Averill, writes: "Jordan is and has always been a kind, empathetic and non-judgmental person. He always did kind and helpful things for others throughout his life without needing attention or compensation for them. He respected people and tried to lift others up even when his anxiety and depression couldn't be lifted. […] Jordan is a good human, a very good human with a strong character and conscience." (Exhibit L).

The people who know Jordan best know that his actions in this case, while deeply regrettable, do not define who he is at heart. They encourage the Court to see a man who, while flawed, has had to endure more than his fair share of trauma, and yet who has gone out of his way to help a great many people.

b.    *Nature & Circumstances of the Offense*

As he approaches his sentencing, Jordan continues to accept full responsibility for the crimes he committed. It is not an overstatement to say that he is riddled with remorse. It is clear to counsel and Jordan's family—and we hope it will be clear to Your Honor—how deeply Jordan appreciates the seriousness of his actions. He not only is prepared to accept punishment, but is determined to engage in the necessary treatment, while he is imprisoned, and upon his release, to address his mental health and the deep-seated traumas which contributed to his having engaged in the instant offenses.  And, perhaps for the first time in his life, Jordan enjoys the full support of his family. As reflected in the letters to the Court, despite the very serious nature of the crimes Jordan committed, there is a community of people ready to help Jordan upon his release from prison and to ensure that he has access to all of the resources available to build a successful future.

20

As discussed in detail above, the circumstances under which Jordan committed the instant offenses are intimately connected to his unique and tragic history. We present these circumstances to the Court not as an excuse for Jordan's actions; there is no excuse for his actions, and he blames no one but himself.  We believe, however, that they provide a window into how an otherwise model human being could have engaged in this behavior.

At the time Jordan began placing ads on Craigslist seeking the companionship of other men with whom to watch pornographic videos, his mental health was at an all-time low. After years and years of silent suffering in the face of unaddressed trauma, in the midst of heavy stress preparing for one of the most important moments in his professional life, and on the heels of the emotionally devastating breakup of the first meaningful relationship in his life, Jordan was deeply depressed and he was in an emotional nosedive.  It is no exaggeration to say that Jordan's life had reached its darkest hour, and he had spiraled out of control.

In the midst of this darkness, Jordan engaged in this extremely dysfunctional and criminal behavior. Specifically, it was during this time in his life when he accumulated many images of child pornography for the purposes of viewing them with other men, and engaged in a months' long back and forth with "Darren," the agent who held himself out as the father of a nine-year old boy, and which culminated in the anticipated Skype session leading to Jordan's arrest.

Simone Gordon, the psychotherapist who spent more than 60 hours interviewing Jordan over the past two years, and who has extensive experience treating both sex offenders and the victims of sexual abuse, opines in her report that: "Jordan's involvement in this matter is a direct result of multiple traumatic events in his life […]." (Exhibit A, p. 36). Jordan experienced as a young boy the loss of his family and the loss of his innocence when he was the victim of sexual abuse. He did not have the coping skills to deal with either trauma effectively. As a teenager,

Jordan further lost his sense of self when he was rejected by his family, and taught to hate himself in conversion therapy. He felt betrayed by his family and by "therapy." He internalized all of his pain and rejection, which manifested itself in worsening depression, anxiety and self-hatred. Jordan's only refuge was in imagining a life not his own. At first, Jordan lived out these fantasies through his life in the theatre, living through the characters he played on the stage. But when Jordan found himself no longer good enough to make it as a performer, he was forced to find other outlets through which to escape the trauma of his own life.

According to Dr. Gordon, as his mental health deteriorated, Jordan eventually created these convoluted obsessive sexual fantasies "as a means of countering his ongoing feelings of annihilation." (Exhibit A, p. 37). In particular, in discussing Jordan's interaction with "Darren," Dr. Gordon notes how Jordan identified with "Darren's" nine-year-old son, and how he associated sexual connection with comfort at that age. Jordan, through the sexualized father-son bond was, in his own convoluted way, trying to make a connection with a father figure that he had never had in his own life. (*See* Exhibit A, pp. 37-38).

As noted in both Dr. Gordon and Dr. Krueger's reports, Jordan's judgment was severely compromised at the time he engaged in the instant criminal conduct because of his Major Depression, the stress associated with the situational factors occurring in his life at that particular point in time, and the lack of proper treatment for his years of trauma. (*See* Exhibit A; Exhibit M). All of those factors, however, can be overcome with proper treatment.

While Dr. Gordon notes that Jordan saw a number of psychiatrists beginning in 2011 for the provision of anti-depressant medication, Jordan's issues require more than just medication; they require intensive therapy, and building back an identity that was destroyed over the course of 30 years. As Dr. Gordon notes, following Jordan's experience with conversion therapy, he

was "too afraid to risk going to see another therapist because he didn't want to risk another round of abuse." (Exhibit A, p. 37). As a result, for years he limped along treating the symptoms with alcohol and anti-depressant medication, but without ever addressing the underlying causes. All the while the pressure continued to build until it finally boiled over.

Both Dr. Gordon and Dr. Krueger see hope for Jordan, because he has begun the work of addressing the underlying trauma at the heart of his issues. Dr. Gordon notes that, shortly before his arrest, Jordan finally sought out a psychotherapist (Dr. Durant) whom he thought could help him, and was in the process of developing trust with Dr. Durant when he was arrested. Importantly, Jordan was able to continue the therapeutic process during the more than 60 hours he spent with Dr. Gordon at the MDC over the past two years. During that time, Jordan "has demonstrated the capacity for reflective-thinking and he has finally been able to speak about his own sexual abuse. He is very motivated to change his behaviors and to take part in a sex offender treatment program." (Exhibit A, p. 38).

According to Dr. Krueger, Jordan's continued treatment makes the risk of his committing another sexual crime of this nature low:

> It is clear that Mr. Cohen's compulsive use of pornography recently was associated with severe depression, and successful treatment of his depression has reduced his risk of engaging in such usage again. Although Mr. Cohen makes criteria for pedophilia and for a paraphilia not otherwise specified, or ephebophilia, this pattern of sexual interest appears to have been of relatively brief (i.e. 9 months) duration. He otherwise has a very strong history of sexual interest in mature males.

> Mr. Cohen's risk according to 4 actuarial instruments (the SVR-20, the SONAR, the Level of Service/Case Management Inventory, and the Hare Psychopathy Checklist) of another sexual crime of this nature is low, and moderate-low according to one (the Static-99R).

(Exhibit M, pp. 11-12).

After working intensively with Jordan over the past two years, Dr. Gordon concurs with Dr. Krueger's opinion. She has discussed with Jordan the need to continue with a course of therapy and Jordan has expressed both a willingness and a desire to continue with therapeutic intervention to help him with the issues that led to his criminal behavior. He is willing to take whatever steps are necessary, including participation in a sex-offender treatment program, to improve his mental health and ensure that the behaviors that led him here will "not be repeated again." (Exhibit A, p. 35).

Dr. Gordon has also worked with Jordan to create a life plan, which we will discuss in greater detail below, encompassing his remaining time in prison as well as when he is released, in an effort to alleviate the stresses inherent in his reintegration into the community and to promote Jordan's ongoing rehabilitation. She is confident that with the proper help, Jordan can successfully implement that plan, and that, above all else, he is worthy of a second chance.

Once again, we in no way wish to minimize the seriousness of these offenses or to excuse what Jordan did. There is no excuse. We wish only to bring to the Court's attention the circumstances occurring in Jordan's life at the time that he engaged in the instant criminal conduct, circumstances which we, and the mental health professionals who evaluated Jordan, believe distinguish him from other sex offenders that have come before this Court.

While these circumstances do not excuse the instant offenses, they place them into context, offer mitigation, and help to explain how a person who has so many good qualities can make the mistakes that Jordan made.

### III.  Remaining Factors of 18 U.S.C. § 3553(a)

*a.*      *The Need for the Sentence Imposed to Reflect the Seriousness*

*of the Offense, to Provide Just Punishment, to Avoid Unwarranted*
*Sentence Disparities, and to Promote Respect for the Law*

As the Court reflects upon the person being sentenced, we urge Your Honor to consider that a sentence of 10 years will reflect the seriousness of the offense, promote respect for the law, provide just punishment, and avoid unwarranted sentence disparities.

Jordan deeply regrets his actions, however, they do not fully define the person being sentenced. Dr. Gordon's report, and the many letters written to the Court demonstrate that the requested sentence will promote respect for the law and provide just punishment. They show that Jordan is a person who is deserving of redemption.

According to Dr. Gordon: "based on […] my thirty nine years as a practicing clinician treating both sexual abuse victims and sex offenders, I believe that Jordan was as much a victim as the victims that these laws are designed to protect." (Exhibit A, p. 39).

This is important because, as Dr. Gordon notes, Jordan, unlike many similarly situated defendants, never possessed the conscious objective of harming the children that were victimized by his actions:

> During the course of the last two years, […] Jordan has demonstrated an awareness of not only his own victimization and the traumatic derailment of development that occurred to him; but he is now cognizant of the harm caused to the unwitting victims of child sexual abuse through the production dissemination and viewing of child pornography. He remains deeply ashamed and depressed to think that his behavior has contributed to the abuse of children. He has vowed to never repeat this behavior again.

(Exhibit A, p. 39).

This observation is echoed by Jordan's friend Monica Isomura: "Jordan Cohen is a kind-hearted, loving, and truly good person who clearly needs psychological help from medical

professionals, but I firmly believe that he does not and never did consciously intend to cause any person harm." (Exhibit J).

 With the work Jordan has already done to confront his past behaviors since his arrest, his demonstrated capacity for self-reflection, and his willingness to engage in much-needed mental health treatment,  those close to Jordan believe he is deserving of a second chance, and that if given that chance, he will make the most of it.

 According to Jessica Gold, who has known Jordan his whole life, and whose experience is informed by her job as a physician practicing on the Southside of Chicago: "I see the effects of childhood trauma daily and how they can lead to poor decision making. With help and rehabilitation, I know Jordan has the potential to become a successful member of society. I, along with my family, [am] committed to helping him along the way." (Exhibit N).

 Jeryl Pine Rothschild, believes that "[i]f there was ever an individual who deserves a second chance this is one. […] [T]his is a young man that given the opportunity can help others and contribute to society in a very positive way. I firmly believe that Jordan's strength, intelligence and moral character along with the continued love and support of this family will prove him as an outstanding contributor to our society." (Exhibit O).

 Wendy Perlberg writes that she "believe[s] in the fight for Jordan," and that he "deserves a second chance." (Exhibit P). "I am convinced that with the love and support of family, friends and professionals, Jordan can re-invent himself and learn to live a respectful and productive life." (Exhibit P).

 Meechal Hoffman similarly shares: "I know Jordan to be very intelligent, compassionate, responsible, and ethically oriented. I also believe that he is capable of change. […] I feel confident that Jordan can emerge from this sentence with the strength and the network of support

he needs to do the hard work of overriding the impulses that led him to make the terrible choices he made." (Exhibit C).

And, in appealing for leniency for Jordan, Kevin Lustik shares: "[Jordan] has a lot to offer. […] I feel in my heart that Jordan could contribute significantly to our society again, given the opportunity." (Exhibit Q).

These family and community members are but a fraction of the people who support Jordan[2]. They know how serious this case is, and that the law carries the power to incarcerate him for a lengthy guidelines sentence, yet they urge the Court to consider that a 10 year prison sentence balances the need to punish Jordan with the other goals of sentencing.

Further, it bears mentioning that, in addition to the obvious consequences Jordan will suffer as a result of any prison sentence the Court imposes, he will also face numerous collateral consequences, including: "ineligibility for federal welfare benefits, public housing, student loans, and employment opportunities, as well as various forms of civic exclusion, such as ineligibility for jury service and felon disenfranchisement." Michael Pinard, *Collateral Consequences of Criminal Convictions: Confronting Issues of Race and Dignity*, 85 N.Y.U. L. Rev. 457, 459 (2010).

In an opinion by E.D.N.Y. Senior District Judge Frederick Block (15-CR-18, Doc. No. 43), he underscores that the effects of these collateral consequences can be devastating. As Professor Michelle Alexander has reminded us, "[m]yriad laws, rules, and regulations operate to discriminate against ex-offenders and effectively prevent their reintegration into the mainstream society and economy. These restrictions amount to a form of 'civi[l] death' and send the unequivocal message that 'they' are no longer part of 'us.'" Michelle Alexander, *The New Jim Crow*, 142 (2010). This is especially true of sex-offenders like Jordan, who are permanently

---

[2] Additional letters not quoted herein are attached as Exhibit U.

branded as "other" like a character in Nathaniel Hawthorne's the Scarlet Letter. As such, he will no doubt face many additional obstacles as he seeks to reestablish himself in the community following his sentence and pursues future employment opportunities.

Lastly, the requested below-guidelines sentence would not result in a disparity when compared to sentences, relative to the guidelines, imposed in this circuit and district, and on defendants sentenced nationally pursuant to the same sentencing Guidelines.  An evaluation of the Sentencing Commission's sourcebook[3] is revealing in this regard.  Of the 3,513 defendants sentenced in the Second Circuit in 2017, 30.9% received a within-the-guidelines sentence, while 37.4% received sentences below the guidelines minimum sentence based solely on *Booker* and the factors of 18 U.S.C. §3553(a). (*See* Exhibit R). And, of the 1,463 defendants sentenced in the Southern District of New York, only 361 (24.7%) received a within-the-guidelines sentence, while 732 (50.0%) received sentences below the guidelines minimum sentence based solely on *Booker* and the factors of 18 U.S.C. §3553(a). (*See* Exhibit R).

Of the 1,403 defendants whose guidelines, like Jordan, were calculated pursuant to U.S.S.G. §2G2.2 in 2017, only 376 (26.8%) received a within-the-guidelines sentence, while 596 (42.5%) received sentences below the guidelines minimum sentence based solely on *Booker* and the factors of 18 U.S.C. §3553(a). (*See* Exhibit R). And, of the 403 defendants whose guidelines, like Jordan, were calculated pursuant to U.S.S.G. §2G1.3 in 2017, only 178 (44.2%) received a within-the-guidelines sentence, while 208 (48.4%) received sentences below the guidelines minimum, including 78 (19.4%) based solely on *Booker* and the factors of 18 U.S.C. §3553(a). (*See* Exhibit R).

Further, the requested sentence would not represent a disparity in sentencing as compared to other defendants who violated 18 U.S.C. §2422(b). *See e.g. United States v. Davey*, 550 F.3d

---

[3] *See* United States Sentencing Commission Sourcebook of Federal Sentencing Statistics for Fiscal Year 2017.

653 (7th Cir. 2008)(affirming 126-month sentence based on defendant's plea to 18 U.S.C. §2422(b), for attempting to entice a 15-year-old girl into engaging in criminal sexual activity); *United States v. Bohannon*, 476 F.3d 1246 (11th Cir. 2007)(affirming 120-month sentence based on defendant's plea to 18 U.S.C. §2422(b), for attempting to entice a 15-year-old girl, into engaging in criminal sexual activity); *United States v. Nagel*, 559 F.3d 756 (7th Cir. 2009)(affirming-120 month sentence based on defendant's plea to 18 U.S.C. §2422(b), for attempting to entice a 14-year-old girl, into engaging in criminal sexual activity); *United States v. Hughes*, 632 F.3d 956 (6th Cir. 2011)(affirming 120-month sentence based on defendant's plea to 18 U.S.C. §2422(b), for attempting to entice a 14-year-old girl, into engaging in criminal sexual activity); *United States v. Brucker*, 646 F.3d 1012 (7th Cir. 2011)(affirming 120-month sentence based on defendant's plea to 18 U.S.C. §2422(b), for attempting to entice a 15-year-old girl, into engaging in criminal sexual activity); *United States v. Hensley*, 574 F.3d 384 (7th Cir. 2009)(affirming 125-month sentence based on defendant's plea to 18 U.S.C. §2422(b), for attempting to entice a 13-year-old girl, into engaging in criminal sexual activity); *United States v. Osborne* (09-CR-14033, S.D.Fla.)(29-year-old defendant sentenced to 120 months upon his guilty plea to 18 U.S.C. §2422(b), for attempting to entice a 15-year-old girl, into engaging in criminal sexual activity); *United States v. Shill*, 13-30008 (9th Cir.)(affirming 120-month sentence based on defendant's plea to 18 U.S.C. §2422(b), for attempting to entice a 16-year-old high school student into engaging in criminal sexual activity).

Therefore, while every case presents different facts and circumstances, given Jordan's unique history and characteristics, his remorse and acceptance of responsibility and the myriad collateral consequences he faces as a 33-year-old first-time sex offender, the requested sentence would not represent a disparity.

b.  *The Requested Sentence Can Provide Adequate Deterrence, and*
  *Protect the Public from Future Offenses by Jordan*

A 10-year prison sentence can provide adequate general and specific deterrence.

The empirical evidence is unanimous that there is no relationship between sentence length and general deterrence, regardless of the type of crime. *See* Andrew von Hirsch *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence.").

While we appreciate the need for general deterrence, it appears to be primarily in the certainty of punishment, not its severity, that deterrent power lies. *See* Steven N. Durlauf & Daniel S. Negin, *Imprisonment and Crime: Can Both be Reduced?,* 10 Criminology & Pub. Pol'y 13, 37 (2011); *See* Valerie Wright, Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* 8 (2010), *available at* http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf.

Studies show that the same is true of specific deterrence; except for the incapacitation effect of incarceration, there is little apparent correlation between recidivism and the length of imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33Criminology 587 (1995)(finding no difference in

30

deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

In fact, it appears that among low-risk offenders, recidivism may, to a limited extent, be fostered, not prevented, by lengthy imprisonment:

> Among low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences. Thus, when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism.

Wright, *supra,* at 7.

Respectfully, Jordan is a low-risk offender who does not need to be incapacitated to be deterred. While the crimes to which he has pleaded guilty are serious, and carry correspondingly significant guidelines offense levels, the Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines' offense level. […] The guidelines' offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004).

On the other hand, social science research indicates low recidivism rates for offenders like Jordan with no prior criminal history. In 2004, the United States Sentencing Commission

("U.S.S.C.") issued a report as part of its research series on the recidivism of federal guidelines offenders entitled: *Recidivism and the 'First Offender'': A component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate*, United States Sentencing Commission, May 2004.  (*See* Exhibit S). In its report, the U.S.S.C. notes:

> The 'first offender' philosophy in sentencing policy generally encourages lower sentences for offenders who have little or no prior criminal conduct. This philosophy, which can be derived directly from the guidelines' Chapter Four introductory commentary, postulates that first offenders are less culpable and less likely to re-offend. As such, they are deserving of reduced punishment.

(Exhibit S, p. 1); *see also* 28 U.S.C. § 994(j).

The U.S.S.C. found that offenders with zero criminal history points have a recidivism rate of only 11.7% (compared with a recidivism rate of 22.6% for offenders with one criminal history point, and 36.5% for offenders with two or more criminal history points).  (*See* Exhibit S p. 13-14, 26).

More specifically, among the category of offenders with zero criminal history points, those offenders who have never been arrested have the lowest recidivism rate at only 6.8% (compared with a recidivism rate of 17.2% for offenders with a history of arrest but no conviction, and 8.8% for offenders with a history of arrest and conviction for only "never-count" offenses specified under §4A1.2(c)(2)).  (*See* Exhibit S, p. 14, 26).

The U.S.S.C. notes:

> Its low recidivism rate makes first offender group A stand out. Recall that group A offenders have no prior criminal events, not even a prior arrest.

(Exhibit S, p. 14).

Jordan falls squarely within offender group A; prior to this case, he had never before been arrested, nor had he committed any other crimes for which he had not been caught. He has lived a thoroughly law abiding life underscored by hard work and sacrifice for others.

Both Dr. Krueger, and Dr. Gordon similarly conclude that Jordan is a low risk to reoffend. According to Dr. Krueger: "Overall, this is Mr. Cohen's first arrest and his first arrest for a sexual crime. He would be readily very manageable in the community under the usual conditions of supervision and treatment imposed by federal probation, and it my opinion that his risk of recidivism, were he released to the community would be very low." (Exhibit M, p. 12).

Dr. Gordon concurs with Dr. Krueger's assessment, and concludes that Jordan "is not a violent criminal nor is he a danger to society." (Exhibit A, p. 38). Further, she believes that Jordan "is totally committed to living a law-abiding, productive life and he is looking forward to rehabilitating himself." (Exhibit A, p. 40).

As part of that rehabilitation, Dr. Gordon has worked at length with Jordan to create a life plan that will help guide him during his remaining term of imprisonment as well as upon his release. Notably, Jordan is interested in completing his PhD while incarcerated, and has explored the "Bard Prison Initiative," a program sponsored by Bard College that allows incarcerated individuals to pursue higher education degrees. He envisions being able to contribute by using his experiences as an educator and a member of the prison population to assist with such initiatives.

During the two years that Jordan has already been incarcerated, he has used his considerable skills as an educator to tutor other inmates studying for their GEDs, and he wants to continue to use his gifts to help other inmates, and, upon his release, to help incarcerated, and

previously incarcerated people pursue educational opportunities. According to Dr. Gordon: "Jordan wants to harness his passion for helping people learn". (Exhibit A, p. 35).

She and Jordan have also discussed the best ways for Jordan to address the issues that led to his involvement in this case. Jordan is committed to pursuing individual psychotherapy with a licensed clinician and continuing on psychotropic medication to manage his depression and anxiety. He has also expressed an interest in participating in a sex-offender treatment program, either while in custody or upon his release, and is interested in participating in a behavioral support group to help him adjust to the stresses of re-entry once he is released from prison.

Dr. Gordon has also recommended that Jordan attend and complete a non-residential substance abuse treatment group while incarcerated, and attend Alcoholics Anonymous meetings upon his release to better understand how drinking, and self medication generally, contributed to his having engaged in the instant criminal conduct, and to help generate a further support network, including a sponsor, who can help him deal with life once he is released. Jordan has been receptive to this, and to taking whatever additional steps may be necessary in furtherance of his rehabilitation.

Something that will help Jordan when he is released from prison is the overwhelming support that has been pledged by his family and friends. One of the positive outcomes of Jordan's arrest and prosecution is that it has forced his family to recognize the part they played in the decline of Jordan's mental health leading up to the instant offenses and in exacerbating his self-hatred and depression. This has brought the family closer than they have ever been, and has led them to finally accept Jordan for who he is and to provide him, for the first time, with the support he so badly needed. With the strong support of his family and friends, Jordan is at even lower risk of reoffending once released.

Lastly, Jordan has expressed real, unmitigated remorse for his actions, which further emphasizes that he is not a danger to reoffend and does not need to be incapacitated to be specifically deterred. Dr. Gordon shares her observations of Jordan's remorse and guilt which she witnessed during their time together. (*See* Exhibit A, pp. 34-35). Jordan's remorse is also a consistent theme in the letters to the Court.

According to Monica Isomura, who visited Jordan at the MDC, he has "expressed the most sincere, heartfelt remorse for the things had had done to get him into his current situation. He was extremely emotional, visibly hurting from the pain of his own regret and shame." (Exhibit J).

Shane Beaux, similarly shares that in his correspondence with Jordan,  "Jordan has expressed deep remorse for his actions and is committed to the long process of rehabilitating himself." (Exhibit G).

And Sheri-Ann Cohen, Jordan's stepmother, writes: "I know he has regrets for what he has done, is remorseful and is prepared to accept the consequences of his actions." (Exhibit T).

What these letters make clear is that Jordan is genuinely sorry for the harm his actions have wrought, especially on the children who have been further victimized by his actions.  He is intent on improving himself and has a genuine wish to build a positive and sustainable life. These letters are a testament to the self-realization that Jordan has already undergone over the past 24 months and are illustrative of the kind of man Jordan intends to be if the Court grants him this one chance.

Respectfully, the public does not need protection from Jordan. His remorse, rehabilitation, life plan, and anticipated supervision, all make him unlikely to reoffend. And, as

35

demonstrated by the letters of support, Jordan has a devoted family who is willing to do everything in their power to support him to succeed when he is released from prison.

Therefore, for all these reasons, a mandatory minimum sentence of 10 years in this case can more than adequately satisfy the need for general and specific deterrence.

c.      *The Requested Sentence is the Safest Option for Jordan*

As a gay man, a prior victim of sexual abuse and a prisoner convicted of a sex offense, Jordan is at a higher risk of violence and sexual assault than other inmates. A real fear exists that the longer Jordan is required to remain in prison, the greater risk he faces of being victimized. We believe this further supports the requested 10-year sentence.

The Bureau of Justice Statistics conducted a study on sexual victimization in prisons and jails from October 2008 until December 2009 based on computer-assisted self-interviews of 81,566 inmates, age eighteen or older, in 167 state and federal prisons and 286 jails in the United States. *See* BJS, Sexual Victimization in Prisons and Jails Reported by Inmates, 2008-09 (Jan. 2010) (A. Beck et al.), available at http://bjs.ojp.usdoj.gov/content/pub/pdf/svpjri0809.pdf [hereinafter BJS Report].

The BJS Report emphasized that two groups of inmates are particularly vulnerable as targets of sexual victimization: inmates who have had a prior history of being victims of sexual abuse and inmates who identify as being other than heterosexual. Among heterosexual state and federal prisoners, an estimated 1.3% reported being sexually victimized by another inmate, and 2.5% reported being victimized by staff. *See id*. In contrast, among prison inmates with a sexual orientation other than heterosexual (including bisexual, homosexual, gay or lesbian, or other),

36

11.2% reported being sexually victimized by another inmate, and 6.6% reported being sexually victimized by staff. *See id.*

Compounding the problem, national studies have found that a significant number of correctional officers believe that homosexual inmates should not be protected from rape or that if homosexual inmates are raped, they got what they deserved. *See* Katherine Robb, *What We Don't Know Might Hurt Us: Subjective Knowledge and the Eighth Amendment's Deliberate Indifference Standard for Sexual Abuse in Prisons*, 65 N.Y.U.ANN.SURV.AM.L.705, 719 nn.69 & 70 (2010) (citing Peter L. Nacci & Thomas R. Kane, *Sex and Sexual Aggression in Federal Prisons: Inmate Involvement and Employee Impact*, 48 FED.PROBATION 46, 48 (1984); Helen Eigenberg, *Correctional Officers' Definition of Rape in Male Prisons*, 28 J.CRIM.JUST. 435, 442 (2000)).

Meanwhile, among inmates who had experienced sexual victimization before coming to the facility, 11.0% of prisoners reported having been sexually assaulted by another inmate at the current facility. *See* BJS Report. An estimated 8.7% of prisoners who had experienced sexual victimization before coming to the facility reported sexual activity with staff. *See id*.

These statistics are troubling. Given that Jordan identifies as a gay man and as a victim of prior sexual abuse, his risk of sexual assault is significantly higher than other inmates in the federal prison population.

Additionally, as a defendant convicted of a sex offense involving children, Jordan will also be stigmatized for his offenses of conviction in a prison culture that requires inmates to "show their papers" whenever they get to their designated facility. The Bureau of Prisons ("BOP") recognizes sex offenders as a vulnerable population  within the prison setting (*see* https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp), where they are  frequently

ostracized or targeted by other prisoners. Nonetheless, the BOP assigns sex offenders a Public Safety Factor ("PSF") which disqualifies them from placement in minimum-security camps, requiring that they be placed in at least a low-security institution. Additionally, with limited exceptions, they are traditionally housed in standard general prison populations. This often exposes them to violence by other inmates to which their only recourse is requesting placement in administrative lockdown in the Special Housing Unit ("SHU").

During the two years that Jordan has spent at the MDC Brooklyn, he has already experienced this. He has been the victim of three "incidents," which resulted in him seeking protective custody in the SHU. On two occasions other inmates threatened him and took his property, and on a third inmates made threatening remarks and referenced his "charges." This series of attacks has left Jordan feeling very vulnerable and afraid as he prepares to transition to his designated facility.

Therefore, given the continued risk of victimization he faces during the remainder of his prison sentence, we respectfully suggest that a sentence of 10 years imprisonment is sufficient but not greater than necessary to achieve the objectives of sentencing.

**IV.  Conclusion**


On behalf of Jordan and his family, we thank the Court for taking the time to consider our

sentencing submission.  We look forward to addressing the Court at the time of sentencing.


Dated:        New York, New York
              March 1, 2019




                                              Respectfully submitted,


                                              /s/ *Edward V. Sapone*
                                              Edward V. Sapone

                                              /s/ *Steven Brill*
                                              Steven Brill

cc:     AUSA Sebastian Swett