

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 15, 2019

**BY ECF**
The Honorable Deborah A. Batts
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Jordan Cohen*, **17 Cr. 289 (DAB)**

Dear Judge Batts:

      The Government respectfully submits this letter in connection with sentencing in the above-captioned matter. Pursuant to a plea agreement dated August 14, 2018, the parties stipulated to a United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range of 210 to 262 months' imprisonment (the "Stipulated Guidelines Range"). For the reasons set forth below, the Government believes that a sentence within the Stipulated Guidelines Range is appropriate.

**I.    Offense Conduct**

      From approximately November 2016 through March 2017, a Special Agent from the Federal Bureau of Investigation ("FBI") acting in an undercover capacity (the "UC") exchanged hundreds of messages with the defendant in which they discussed trading child pornography and the possibility of the defendant having sex with the UC's fictitious nine-year-old child. (PSR ¶ 10). In February 2017, the defendant and the UC agreed to conduct a video call over Skype, during which the UC would molest his child, and the defendant would show the UC his collection of child pornography. This meeting would serve as final proof that the UC was not a police officer, after which the defendant would meet with the UC and his child to engage in sexual activity. (PSR ¶ 11).

      On March 2, 2017, the UC and the defendant met on a video call over Skype. Just as the UC said he was bringing the child into the room to participate in the call, FBI agents executed a search warrant at the defendant's apartment. The agents seized an external hard drive and other devices that, cumulatively, contained approximately 50,000 images of child pornography and approximately 2,400 videos of child pornography. (PSR ¶ 15). A search through the defendant's email account revealed that the defendant was in constant contact with others to trade child pornography, and on occasion asked if these individuals had access to children. (PSR ¶ 18).

## II. Procedural History

The defendant was charged by complaint on March 3, 2017, with one count of coercion and enticement of a minor to engage in illegal sexual activity, in violation of 18 U.S.C. § 2422(b) and 2, (Count One), one count of inducement of a minor to engage in sexually explicit conduct, in violation of 18 U.S.C. § 2251(a), (e), and 2 (Count Two), one count of receipt of child pornography, in violation of 18 U.S.C. § 2252A(a)(2)(B), (b)(1), and 2 (Count Three), one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B), (b)(2), and 2 (Count Four), and one count of transportation of child pornography, in violation of 18 U.S.C. § 2252A(a)(1) (Count Five). (Dkt. 1).

On May 15, 2017, the defendant was charged in an Indictment on Counts One through Four. (Dkt. 13). On August 20, 2018, the defendant pleaded guilty, pursuant to a plea agreement, to Counts One and Four of the Indictment.[1] PSR ¶ 7. The plea agreement set forth a Stipulated Guidelines Range of 210 to 262 months' imprisonment with a mandatory minimum term of 120 months' imprisonment, based on an offense level of 37 and a criminal history category of I. *Id.*

On December 18, 2018, the Probation Department issued the final Presentence Investigation Report ("PSR"). The PSR calculates a Guidelines Range of 210 to 262 months' imprisonment, with a mandatory minimum term of 120 months' imprisonment. The Probation Department recommends a sentence of 210 months' incarceration, followed by five years' supervised release.[2] (PSR at 23).

On March 1, 2019 the defendant submitted a sentencing memorandum and accompanying exhibits, arguing for a 120-month sentence, citing, among other things, his difficult upbringing, his genuine remorse, and his plan to rehabilitate his life after incarceration.

## III. Discussion

### A. Applicable Law

As the Court is aware, the Guidelines still provide strong and relevant guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), although they are no longer mandatory. "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range"—that range "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49

---

[1] The Government has received ten requests for restitution from the victims of the defendant's crime. One victim requests $15,000 in restitution, two victims request $10,000, one victim requests $9,000, five victims request $5,000 each, and one victim has not provided a specific restitution request. The Government requests that the Court's Order of Restitution be delayed for one month after sentencing to allow the parties to reach a final agreement on restitution or to raise any outstanding issues concerning restitution with the Court.

[2] The Government agrees that a term of supervised release of at least five years is required by statute. *See* 18 U.S.C. § 3583(k).

(2007). As the Second Circuit has noted, although the Guidelines do not dictate a presumptively reasonable sentence, they are not merely a "body of casual advice." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted). The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349.

After making the initial Guidelines calculation, a sentencing judge must then consider the seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who engaged in similar conduct"; and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall,* 552 U.S. at 50).

### B. A Substantial Sentence of Imprisonment Is Warranted in this Case

The Government respectfully submits that a sentence within the Stipulated Guidelines Range is warranted in this case because of the seriousness of the charged conduct.

The defendant undertook to commit a horrific crime. Over several months, he and the UC exchanged hundreds of messages in which the defendant discussed his desire and intention to rape the UC's nine-year-old child. These conversations ranged from the mundane to the perverse. They

contemplated many potential meetings, and bringing other molesters into the criminal conduct. The messages clearly show that the only things stopping the defendant from taking the final step was a concern that the UC was in fact a police officer. Yet whenever it seemed that the conversation had hit a dead end, it was the defendant, not the UC, who kept the conversation alive in the hopes of finding a way to meet with the UC and his child for sex. While the proposed "Skype date" was initially an opportunity to verify that the UC was not a police officer, in messages leading up to March 2, 2017, the defendant expressed how excited he was to watch the sexual assault of his future victim. To be clear, when the defendant logged onto Skype on March 2, 2017, he fully expected that a father would molest his nine-year-old child, in part for the defendant's sexual gratification.

In addition to the defendant's efforts to recruit live victims, the defendant victimized hundreds of children through his possession of child pornography. The FBI recovered approximately 50,000 images of pornography and erotica from the defendant's external hard drive, as well as approximately 2,400 videos.[3] Among the images of child pornography discovered in the defendant's possession, were many that featured sadistic or masochistic conduct inflicted on pre-pubescent children. He did not keep these images and videos to himself. Rather, he constantly met up with other individuals to share files and view pornography together. As the Second Circuit has noted,

> there can be no question that the dissemination of child pornography is a serious crime that causes real injury to particularly vulnerable victims. As Congress, courts, and scholars all recognize, child pornography crimes at their core demand the sexual exploitation and abuse of children. Not only are children seriously harmed—physically, emotionally, and mentally—in the process of producing such pornography, but that harm is the exacerbated by the circulation, often for years after the fact, of a graphic record of the child's exploitation and abuse.

*United States v. Reingold*, 731 F.3d 204, 216 (2d Cir. 2013); *see also New York v. Ferber*, 458 U.S. 747, 757-59 & nn. 9-10 (1982) (citing congressional and scholarly reports, and court cases). It is precisely because "[c]hild pornography harms and debases the most defenseless of our citizens" that "[b]oth the State and Federal Governments have sought to suppress it for many years, only to find it proliferating through the new medium of the Internet." *United States v. Williams*, 553 U.S. 285, 307 (2008). "The prevention of sexual exploitation and abuse of children constitutes a government objective of surpassing importance," *Ferber*, 458 U.S. at 757, and this interest extends to seeking to stamp out child pornography at all levels in the distribution chain. *Osborne v. Ohio*, 495 U.S. 103, 110 (1990).

The Supreme Court recognized in *Paroline* that a child pornography victim "suffers continuing and grievous harm as a result of her knowledge that a large, indeterminate number of individuals have viewed and will in the future view images of the sexual abuse she endured." *Paroline v. United States*, 134 S. Ct. 1710, 1726 (2014) (also finding that harm to a child pornography victim is caused by "the trade in her images," and that a defendant who possessed

---

[3] Some of these images and videos appear to have depicted adult pornography, but the vast majority is child pornography.

such images "is a part of that cause, for he is one of those who viewed her images."). "Harms of this sort are a major reason why child pornography is outlawed," and "[t]he unlawful conduct of everyone who reproduces, distributes, or possesses the images of the victim's abuse . . . plays a part in sustaining and aggravating this tragedy." *Id.*

The seriousness of the charged conduct is further reflected in uncharged conduct the FBI discovered in the course of this investigation. During his post-arrest statement, the defendant admitted to both sexual activity with one minor and video chats during which he watched minors masturbate. Additionally, the FBI has reviewed the defendant's email account, which shows that the defendant was not only looking for adults with access to children, but was also in communication with at least one individual who appeared to be a minor.

## IV. Conclusion

For the reasons set forth above, the Government does not oppose a sentence below the Stipulated Guidelines Range of 210 to 262 months, but believes that a substantial sentence of imprisonment above the mandatory minimum sentence of 120 months' is warranted.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____
Sheb Swett
Assistant United States Attorney
(212) 637-6522

cc: Stephen G. Brill, Esq. (via ECF)
    Edward V. Sapone, Esq. (via ECF)