```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        17 CR 289 (CM)

 5   JORDAN COHEN,

 6              Defendant.               Sentence
     ------------------------------x
 7
                                         New York, N.Y.
 8                                       May 11, 2021
                                         3:10 p.m.
 9

10   Before:

11
                        HON. COLLEEN MCMAHON,
12
                                         District Judge
13
                            APPEARANCES
14
     AUDREY STRAUSS
15        United States Attorney for the
          Southern District of New York
16   BY:  SEBASTIAN SWETT
          Assistant United States Attorney
17
     SAPONE & PETRILLO, LLP
18        Attorneys for Defendant
     BY:  EDWARD V. SAPONE
19        -and-
     SULLIVAN & BRILL, LLP
20   BY:  STEVEN BRILL

21

22

23

24

25
```

1          (Case called) United States v. Jordan Cohen.

2          MR. BRILL:  Steven Brill 3:10 p.m.

3          MR. SWETT:  Good afternoon, your Honor, Sheb Swett on

4   behalf of the United States.

5          THE COURT:  Good afternoon.

6          MR. SAPONE:  Good afternoon, your Honor, Edward Sapone

7   and Steven Brill on behalf of defendant Jordan Cohen, who is

8   seated in the middle.  We are ready for sentencing.

9          THE COURT:  Thank you.  Good afternoon, everyone.

10         This matter is on for sentencing on docket No. 17 CR

11  289, United States of America v. Jordan Cohen.  Mr. Cohen,

12  having been found guilty by plea to one count of attempted

13  coercion and enticement of a minor to engage in illegal sexual

14  activity, a class A felony, in violation of 18 United States

15  Code Section 2422(b).

16         This crime carries a statutory mandatory minimum term

17  of ten years to a statutory maximum term of life imprisonment

18  with a maximum term of five years' supervised release, a fine

19  of up to $250,000, and a $100 special assessment, plus a

20  special assessment of $5,000 under the JVTA, and one count of

21  possession of child pornography, a class C felony in violation

22  of 18 United States Code Section 2252(A)(a)(5)(B) and 18 United

23  States Code Section 2252 (A)(b)(2).

24         This crime carries a statutory penalty of not more

25  than 20 years' imprisonment, a maximum term of three years'

supervised release, a fine of up to $250,000, a $100 special
assessment, plus the additional JVTA $5,000 assessment.  In
connection with today's proceedings -- I should say, first of
all, that the judge to whom this case was wheeled out was the
late Deborah Batts.  I inherited this case following Judge
Batts' untimely death.  This is quite literally my first
encounter with the case.

        In connection with today's proceedings I have received
and reviewed the presentence investigation report prepared by a
United States Probation Officer Specialist, Ross Kapitansky.
It was filed originally on December 18, 2018, which was in
connection with the sentencing that was anticipated for early
2019, which is, of course, when Judge Batts died.

        And I have a letter, dated May 3, 2021, on the
stationery of the United States Attorney's Office for the
Southern District of New York, and attached to it a letter,
dated March 25, 2020, from the United States Attorney's Office
for the Northern District of New York.  That letter is a letter
addressed to Mr. Swett.

        I have two presentence memoranda from Mr. Sapone,
Mr. Brill.  The first one was filed in March of 2019.  It
contains a lengthy brief of some almost 40 pages, 39 pages, a
forensic psychosocial assessment prepared by Simone Gordon and
then a large number of letters from people who are friends and
acquaintances, family members of Mr. Cohen, and a psychiatric

1   and risk assessment of Mr. Cohen prepared by Dr. Richard B.

2   Krueger, diplomat in psychiatry from the American Board of

3   Psychiatry & Neurology.  I have his rather lengthy report.  I

4   have his curriculum vitae, his list of publications.

5           And then some more letters and, finally, a document

6   from the United States Sentencing Commission called recidivism

7   and the first offender, which is dated May of 2004.

8           That's the original sentencing submission that was

9   prepared for Judge Batts.

10          On May 4 of this year, I received an additional

11  sentencing submission on Mr. Sapone's letterhead, a very long

12  and eloquent letter with still more letters of support

13  attached.  I believe this is actually a different and an

14  updated report by Mr. Krueger, if I'm right.

15          Is that right, Mr. Sapone?

16          MR. SAPONE:  You are correct, your Honor.

17          THE COURT:  Dated April 29, 2021.

18          Is there anything else that I should have seen in

19  writing prior to today's proceedings?

20          From the government.

21          MR. SWETT:  Your Honor, I submitted a sentencing

22  submission in preparation and in anticipation of the sentencing

23  before Judge Batts.  It's been superseded by the --

24          THE COURT:  I don't have it.  It wasn't in the folder

25  that we inherited.

1              MR. SWETT:  I don't have a copy of it printed.  It

2     should be on the docket.  It has been superseded, so I won't be

3     relying on it for today's sentencing.

4              THE COURT:  Anything else from the defense?  Mr.

5     Sapone.

6              MR. SAPONE:  Can we talk about the presentence report

7     and any objections?

8              THE COURT:  I am not there yet.  I am asking if there

9     is anything else I should have seen from the defense.

10             MR. SAPONE:  No, your Honor.

11             THE COURT:  Has the government reviewed the

12    presentence report?

13             MR. SWETT:  Yes, your Honor.

14             THE COURT:  Any additions, deletions, or corrections?

15             MR. SWETT:  No, your Honor.

16             THE COURT:  Does the government now make the motion

17    that's contemplated by its letter of May 3, 2021?

18             MR. SWETT:  Yes, your Honor.

19             THE COURT:  Since Mr. Sapone wants to say something

20    about the presentence report, let's get that out of the way.

21             Mr. Sapone, have you reviewed the presentence report

22    and gone over it with your client?

23             MR. SAPONE:  Yes, your Honor.

24             THE COURT:  Do you have additions, deletions, or

25    corrections that you want to make?

1          MR. SAPONE:  We do, your Honor.

2          THE COURT:  What?

3          MR. SAPONE:  Paragraph 95 ties your Honor's hands in a

4    way that they should not be tied.  Paragraph 95 says that the

5    maximum term of supervised release that your Honor can and

6    impose is a term of five years when, in fact, it should read a

7    minimum term of five years up to a term of life and that is as

8    to both counts, Counts One and Four.

9          THE COURT:  Does the government agree with that?

10         MR. SWETT:  Yes, your Honor.

11         THE COURT:  A minimum term of supervised release of

12   five years to a statutory maximum term of lifetime supervised

13   release.

14         Is the minimum term on Count Four three years, Mr.

15   Sapone?

16         MR. SAPONE:  I think it's five years.

17         THE COURT:  Has it changed?

18         Let's pull out the statute.  18 3583(b)(2).  I have to

19   tell you, this is like the case that I rarely read in the

20   presentence report because it's just jargon.  It's not what's

21   of interest to me.  What's of interest to me is information

22   about the defendant.

23         MR. BRILL:  Your Honor, if I may, it's also

24   subdivision K, as in Karen, which establishes the minimum of

25   five, maximum of life.

1          THE COURT:  This is an amendment of recent vintage?

2          MR. SAPONE:  I think so, your Honor.  Not that recent.

3          THE COURT:  We will certainly have to call this to the

4    attention of probation.  3583(k) is the relevant section.

5          That changes what I said originally about Count Four.

6    It doesn't change what I said about Count One originally.  I

7    originally said that Count Four had a maximum term of three

8    years' supervised release.  That, it turns out, is not correct.

9    Has a minimum term of five years' supervised release to a

10   statutory maximum of life.

11         Aside from paragraph 95, anything else, Mr. Sapone?

12         MR. SAPONE:  No, your Honor.

13         THE COURT:  Let me hear the government on sentencing.

14         MR. SWETT:  Thank you, your Honor.

15         We are requesting a sentence substantially below the

16   guidelines in this case.  I think it's fair to say that this is

17   one of the most difficult cases that I have dealt with as AUSA,

18   certainly when it comes to contemplating the appropriate

19   sentence.  It's a case that involves many different factors.

20   And while individually they might not be that complicated, they

21   elicit such a broad array of emotions and responses, from

22   disgust, to anger, to sympathy.  I have thought a lot about

23   this case, and I have talked about this case a lot with defense

24   counsel.

25         But of all the things to focus on today, I would like

1    to draw the Court's attention to the government's perspective

2    on the defendant's acceptance of responsibility and the

3    government's belief that the defendant truly feels remorse for

4    what he has done and understands what will be necessary to live

5    a productive life and to protect himself and others from the

6    danger of child exploitation in the future.

7            When the defendant was arrested, there was a sting

8    operation, as the Court has read, I'm sure, where he believed

9    that he would be watching a father molest his child as part of

10   a relationship towards developing his own predatory encounter

11   with a child.

12           That was, in fact, the beginning of a search warrant

13   and as soon as he logged on, FBI agents rammed down his door

14   and went in to arrest him, or at least to search his apartment.

15   And he threw his external hard drive out of the window which

16   contained the reams of child pornography on it.

17           After the agents had secured the area, after they had

18   done their search, they sat down and spoke with him

19   voluntarily, and there is a recording of that which I have

20   listened to several times.  The defendant is nervous, but he is

21   evasive and has sort of a forced casualness about him as he is

22   talking to the agents about how this is a misunderstanding, the

23   things that were happening were not as bad as they thought.

24           Then the lead agent said to him, we have the hard

25   drive that you threw out of the window, and there is a visible

1   change -- not visible, because it's a recording, but there is

2   an audible change, and the defendant realizes at that moment

3   that the game is up, so to speak.  The interview takes a very

4   different turn from that point on.

5           I can't get inside of Jordan Cohen's mind, but I do

6   believe that, symbolically, throwing the hard drive out of the

7   window in many ways represented the way he viewed that part of

8   his life, certainly the way he viewed the victims in this case.

9   When he was confronted with that issue, I believe that that was

10  sort of the first step on a road that has taken him to what I

11  think is a very different place now.

12          I would note that the defendant expressed an interest

13  in cooperating early on, but the government had really no need

14  for him.  He wasn't charged with the goal of using him against

15  anyone else.  But there were a lot of conversations about

16  mitigation and about contextual -- not contextualizing, because

17  he can't contextualize what he did, but reaching an appropriate

18  resolution, given all the factors in this case.  I got a flavor

19  for who the defendant was.

20          Even after he had pled, after we were sort of gearing

21  up for sentencing, we were approached by the Northern District

22  of New York, and they needed him.  They needed him to deal with

23  a recidivist child pornographer user who was advancing a

24  completely false defense at trial.

25          Knowing what I knew about the defendant, knowing what

1    I knew about the importance of their case, we gave them

2    permission to use Mr. Cohen, or to meet with him, but with no

3    promises, with absolutely no guarantee of cooperation, of a 5K

4    letter.

5          To the defendant's credit, he took them up on that

6    offer.  He went to the Northern District of New York.  It seems

7    as though it was quite disruptive for him, but he met with

8    them, he told them everything he knew, and he took the stand

9    and testified about his own involvement with this defendant,

10   Benjamin Jakes-Johnson, but also about really sort of the dark

11   place that he was in.

12         On the stand he incriminated himself in hands-on

13   contact, which was with a 15 or 16-year-old.  We are not

14   talking about infants.  But he was willing to admit that he had

15   done terrible things, and he was there to be truthful and to

16   help the jury assess the credibility of another person's

17   defense.

18         After that happened, as is typical for cooperators in

19   the Southern District, I felt it was appropriate to debrief him

20   myself because I wanted to know if there was anything else

21   about him, if there were other things that would impact whether

22   he got a 5K letter or whether he was being completely truthful

23   with us.  It wasn't the most extensive proffer.  It's not the

24   most developed relationship I've had with a cooperator where

25   I'm in this position.

1          But I can say that the person I spoke to on that phone

2    demonstrated an authentic understanding of what had sort of

3    been left in his wake.  It's a very sad case of someone who has

4    the intelligence and the resources and the capability to have

5    chosen a different path.  He didn't.

6          Where he is, that path was sort of chosen by him or

7    chosen for him through law enforcement that became aware of him

8    and through an increasing series of bad decisions and really

9    sort of destructive and exploitative decisions.  But the person

10   I spoke to understood all of that.  As I read the submissions,

11   as I read the reports, as I read the letters, I do feel that

12   the defendant has that sort of -- that difficult-to-define sort

13   of self-awareness of who he is and what he did, what that means

14   now, what that means in the future.

15         It's hard to feel like this is a hopeful moment

16   because I believe that the Court will impose a lengthy term of

17   imprisonment, and I believe that that is appropriate.  But

18   there is a part of me, as I read all of the defendant's

19   submissions and as I thought about this case, I couldn't help

20   but feel as though Jordan Cohen truly understands who he is and

21   that alone, it's not enough, but it's a start to repairing what

22   he has done and ensuring that what he leaves on this earth is

23   not just a criminal caption and a judgment entered in the

24   Southern District of New York.  I believe that that's the case.

25   I hope that is the case.  I think there are people in this

1    courtroom who are more qualified to opine on that.

2          In my position I get to see a lot of defendants and I

3    get to speak with them and, you know, I don't think I have a

4    perfect intuition on these things, but I do believe, to a

5    degree that I rarely see, the defendant is no longer thinking

6    about the children in those videos as something that can just

7    be tossed out of the window for expediency sake.  I think he

8    understands how devastating it was for them and for him and for

9    his family and that it is going to take work and it's going to

10   take commitment and it's going to take a support network to

11   ensure that that doesn't happen again.  I told the defendant

12   this when we spoke, and I'll tell it to the Court as well.  I

13   do not believe that his life needs to be defined entirely by

14   this experience.  Certainly the guidelines range that we have

15   all agreed to would effectively -- wouldn't end his life, but

16   would cut out a significant portion of his life, and I don't

17   think that's necessary.

18          THE COURT:  Can I ask what guidelines range he has

19   agreed to?

20          MR. SWETT:  We agreed to a range of 210 to 262 months.

21   Defense is asking for a term of seven years.  I am not going to

22   make a specific recommendation, unless the Court asks for us,

23   but I will say that the defendant did earn his 5K.  He earned

24   the ability for the Court to use its discretion.  I think that

25   with all of the pain and disgust and frustration and horrible

1   things that you have on one side, I do find myself hoping that

2   all the good things in Mr. Cohen and in those around him are

3   going to ultimately prevail.  That's what I hope.

4          I'm happy to answer any other questions if the Court

5   has them.

6          THE COURT:  Thank you very much, Mr. Swett.

7          Mr. Sapone, I'll hear you on sentencing.  I think you

8   can assume that I'm very likely to grant the government's

9   motion.

10         MR. SAPONE:  I appreciate that, your Honor.

11         Your Honor, may I remain at the table?

12         THE COURT:  I would actually like you to sit down, if

13  that's OK.  I should have told the same thing to Mr. Swett.

14  Pull the microphone in a little bit, Mr. Sapone.

15         MR. SAPONE:  Yes, your Honor.

16         I want to say good afternoon to your Honor and to

17  Mr. O'Neill and to Mr. Swett and everyone and introduce the

18  Court, if I could very briefly, to a group of people that have

19  come to support Mr. Cohen, including Mr. Cohen's mother and his

20  father and his stepfather and family friends.  We have

21  professors in the audience.  We even have a former Federal

22  Defender who represented Mr. Cohen before he hired Mr. Brill

23  and then brought me on board.  She came here to support him,

24  which I appreciate very much.  We have Mr. Cohen's brother.  So

25  we have a large group of loved ones, including family and

1   friends and people -- sort of his career path, although in the

2   past, hopefully in the future, too.  I just wanted your Honor

3   to know who these folks were who come here and fill your

4   courtroom.

5          Your Honor, I appreciate the comments of the

6   government.  One comment I'd like to make is, what I heard was

7   not just sort of a recitation of the 5K1.1 factors, but that

8   the government believes that a substantially below the

9   guidelines sentence is appropriate, and I heard additional

10  factors beyond just 5K1, which I was taken by.

11         I heard acceptance of responsibility and remorse, an

12  authentic understanding that Mr. Cohen get it, which I think is

13  very important for a defendant sitting before a judge such as

14  yourself.

15         Your Honor, there is an easy path for me today and the

16  right path.  In other words, I could sit here and, through this

17  mask, I could say, you know, please impose the least amount of

18  time you can, and then I can harp on all of the good things

19  there is to say about Jordan Cohen and his hard work, he has

20  more degrees than a thermometer, and go on and on and on about

21  these accomplishments and then sit down and leave it to your

22  Honor to fashion a sentence that's sufficient but not greater

23  than necessary to achieve the goals of sentencing.  That's the

24  easy way and I see colleagues do it every day.

25         The right way is for me to go out on a limb, and it's

1    different when we just put it in writing and sort of hide

2    behind the 39-page brief, as opposed to being vocal in public

3    about our request.  I think that that is the right way.

4           To assist the Court as to what we believe the

5    appropriate sentence is as we consider the whole person, Jordan

6    Cohen, we are asking your Honor to fashion a sentence of 84

7    months of imprisonment, and we think that the path to 84 months

8    includes an analysis of the nature and circumstances of the

9    violence, Mr. Cohen's history and characteristics, the

10   government's 5K1.1 motion, an analysis of the need to avoid

11   disparities of sentences, general deterrence, the conditions of

12   confinement that Mr. Cohen has undergone for all these years,

13   leading up to today, whether or not a lengthy term of

14   supervised release can replace some otherwise prison time,

15   specific deterrence, and, finally, a life plan, which we have

16   laid out for you in writing and Mr. Brill is going to discuss

17   today.

18          In addition, we have a very, very large analysis by

19   Simone Gordon, licensed clinical social worker, with a ton of

20   experience, has worked in every arena imaginable in this area

21   of psychology, very reputable, as well as Richard Krueger, who

22   actually has his own program for offenders like Mr. Cohen so

23   that they don't have to rot in prison when they come out.  They

24   can actually rehabilitate themselves.  There is a lot that

25   Dr. Krueger had said.

1            We are going to divide this in two, with your

2    permission.  I am going to start off and then Mr. Brill is

3    going to take over.

4            Your Honor, as to the beginning part of my monologue,

5    I am not going to start talking about how great Mr. Cohen is.

6    I want to start with what's most important, which is the nature

7    and circumstances of the offense.  Horrible case.  Horrible

8    case.  Two charges, Counts One and Four.  Possession of child

9    porn where there are real victims.  Because every time those

10   images are viewed, those children are victimized again and

11   again and again.  It's not a victimless crime, as you know.

12   And the victim impact statements speak to it and they do a very

13   good job of the damage done:  Attempted coercion of a minor,

14   which if you thought that the criminal possession of child porn

15   couldn't get any worse, now you go to Count Four and it's even

16   worse.

17           THE COURT:  You go to Count One and it's even worse.

18           MR. SAPONE:  That's right.  How do you really judge

19   it.  The bottom line is, is the word reprehensible, is the word

20   unimaginable, is it unthinkable?  Whatever you want to say,

21   horrible charges, so I am not going to run from them.  That's

22   not fair to you.  We recognize that.  We appreciate the

23   government's comments, and we want to reiterate at least that

24   portion of Mr. Swett's thoughts unacceptable.

25           Now, as to the possession charge, I note that there is

no mandatory minimum, not that it would matter because we are here on a 5K1 government motion. But it speaks to an aspect of a charge in that Congress did not impose a mandatory minimum for that offense.

And I note that when I first started practicing 20 some odd years ago, the sentences for the possession cases were absolutely through the roof and there has been a trend in a different direction. The case *Dorsey* comes to mind and Judge Weinstein and different analyses, which in no way minimize how serious it is. But we are in the year 2021, and I would like to venture to guess that prison is not the only way to deal with the unthinkable type of offense, and that is as to both.

As to the attempted coercion, your Honor, no comment I make should suggest that I believe that that charge is anything less than the adjectives that I just used, but I want to, as we talk about the nature and circumstances of the offense, say unequivocally, horrific crime, no way to mitigate it. It's amongst the worst. No doubt about it. Mr. Cohen did it and he has accepted full responsibility for it. No doubt about that.

But if I may, thank goodness this is not one of the cases in which there is a father and there is a son and a defendant entices the father to do the things that they spoke about in the conversations. In other words, there are some cases where it actually occurs. Those are the real cases, a real father, a real son, and it really happens.

1          That does not mean in any way that Mr. Cohen is not

2    100 percent guilty for the offense.  And his conversations with

3    the agent, who was posing as a father, they don't get much

4    worse than those conversations.  No doubt about it.  But if

5    this were a case where there were a father and there were a

6    son, and it happened, then your Honor would consider that.

7          I'm pointing out perhaps the obvious and saying thank

8    God it's not one of those cases.  Is it any less serious?  Are

9    Mr. Cohen's words any less impactful?  No.  But in terms of the

10   circumstances of the case, thank goodness that's what it is.

11         Your Honor, these offenses Counts One and Four, took

12   place in around seven to nine months, of this 35-year-old man's

13   life, seven to nine months.  I always want to know, how did we

14   get here.  In other words, he sits here as a 35-year-old man

15   with many accomplishments, yet, for a seven to nine-month

16   period of his life, notwithstanding the support that's half

17   filling the courtroom, for seven to nine months, this is what

18   he engaged in.  Is it because he's evil?  Is it because he's

19   hell bent on committing crime?  That's where we look at the

20   man's life and we look at the whole person.  The answer is no

21   to both questions.

22         We have seen many kinds of defendants in our

23   collective -- I don't want to give the number of years, but

24   there is lots of experience in this courtroom, and many

25   different kinds of defendants walk in here.  He is not evil and

1   he's not hell bent on committing crimes.

2           Why is he sitting between Mr. Brill and myself?

3   Without excuse, but only by way of potential explanation, there

4   were lots of factors that converged upon him and pushed him

5   down into an abyss, and he made the choices.  He made the

6   decisions.  No one forced him to do it.  So he's guilty.  No

7   doubt about that.

8           But, this is someone who himself, when he was seven

9   years of age, was raped by a camp counselor.  This is

10  someone -- many people suffer, but it affects children in

11  different ways.  Mom and dad, both of whom, again, are here

12  could not remain together and they divorced, and it had a very

13  horrible impact on the boy, Jordan Cohen.  In his life, when he

14  was a boy, it did something to him.  So now things are starting

15  to pile up on his mind and on his motions, at around that time,

16  raped by a camp counselor when he is supposed to trust those

17  around him.  And of course the footnote is, look at what he

18  did, I know, I get it.  But it doesn't take away from what

19  happened to him and it's relevant.

20          So now mom and dad are not together.  He is now in a

21  strange environment with a stepfather who is a wonderful man

22  here in court.  Certain mistakes were made, no doubt, and he is

23  raped.  Then he starts to act as an adolescent and a preteen in

24  a way that in his household, with mom and stepdad, his

25  demeanor, his affect is not appreciated.

1          He is different from his brother, who is here in

2     court.  He doesn't act like a quote/unquote boy.  He is not

3     into rough sports.  Why don't you play football?  What are you

4     doing playing with dolls?  He is feminine, and he's

5     uncomfortable in his own skin, in his own home, but he doesn't

6     really know why.  He just knows that when he looks in the

7     mirror, he hates himself, and his mother doesn't really know

8     what to do.

9          Then at a certain point in his teenage life, he is

10    around 16, and he has a very strong bond with his brother

11    because they are in this together, because they lost the union

12    of their parents.  And the boy he trusts -- again, wonderful

13    guy, wonderful.  He loves his brother and vice-versa, and they

14    have gotten past it, but he gets outed, he gets outed as

15    possessing gay pornography because he is gay.

16         Now he can't trust the camp counselor, he can't trust

17    his parents or his stepfather, and he can't even trust his

18    brother in arms in the battle because now the brother tells on

19    him, he is gay, and now the secret is gone.  He has got to deal

20    with it.  And now that's something else to look at when he

21    looks in the mirror, and it's all piling up on as he is growing

22    up.

23         What do they do?  They send him for therapy.  But it's

24    a different kind of therapy.  Unbeknownst to Jordan Cohen, it's

25    conversion therapy.  Now he has got a rabbi he is supposed to

trust, and instead of the rabbi giving him therapy to empower

him and to tell him it's OK, you are loved, you are enough, you

are sufficient, you should feel good when you look in the

mirror, the rabbi is telling him he is evil and he's bad

because he is gay.  And he tries to convert him, the rabbi

does, to be straight.  It's outlawed in most states in these

wonderful United States, conversion therapy.  So he goes

through that.

He is studying for the Ph.D. exam, and he is involved

in one significant relationship that he finally has the courage

to engage in, and that breaks up.  That's the lead-up to the

seven to nine months that we are talking about.  Does it excuse

the misconduct?  Absolutely not.  In no way does it excuse it.

But the experts, people much smarter in this

discipline than I'll ever be, because I am not a psychologist,

they talk about the weight of the pressures and the depression

and the anxiety, and he is taking antidepression medication.

He doesn't trust psychotherapists after what happened with

conversion therapy.  But he takes pills and it's not enough.

But he knows he has a problem.

He is not just doing all this happy.  He doesn't know

why he is doing it.  He just is.  It pushed him down into the

darkest point of his life, and the medicine wasn't enough.

Just as he started to trust and say, hey, let me sit with a

therapist, he gets arrested, so it never materializes in a way

1   that helps him to prevent us being here.  Who knows.  Maybe if

2   that would have started before, we wouldn't be here.  We would

3   be on another case.

4          Never by way of excuse, but potentially by way of

5   explanation, and really why does it matter?  I always want to

6   know what brings us here.  But, more importantly, what does the

7   future look like?  Is Jordan Cohen redeemable?  In other words,

8   sometimes why we are here matters as to where we are going.

9          Mr. Brill explained why we believe, yes, prison is

10  always one way to deal with somebody, right.  If we want to

11  just look at the surface of things, you just put them in jail.

12  But there are other ways, of course, and we have a very

13  thoughtful life plan that we are going to ask you to consider

14  momentarily.

15          Now, is this Ed Sapone saying these things about

16  Jordan Cohen?  Well, we have 31 letters that I know you read,

17  because I know your work ethic, and I am not going to quote

18  from any of them because I know you read them.  But the 31

19  letters written by these people and others, that's where this

20  is coming from.  It's coming from the people who best know

21  Jordan Cohen, not me.  I'm just a conduit.  I learned it from

22  the letters.  I learned it from the countless conversations

23  with mom that if you look at my phone bill, you might thinking

24  I am having an affair because of all of the late-night calls,

25  and three hours and two hours and an hour and the weekend and

1    Sunday nights, because she is hurting, your Honor and she is

2    not the only one.  They all are because they know what Jordan

3    Cohen really is.  They know who he is.  They know what he did,

4    and not one person in here condones it, but they also know that

5    that is that does not paint a full picture of this whole

6    person.  So that's how I know it.

7          Now, we would not be asking for an 84-month sentence

8    if it weren't for 5K1.1.  I wouldn't do it.  I wouldn't sit at

9    the table and ask you because it would be unreasonable.  Are

10   there sentences throughout these United States in the circuits

11   and in this one that are in that range without cooperation,

12   assuming no man min?  Sure.  The sentences are all over the

13   board.  For every low sentence, Mr. Swett could come in with a

14   high sentence.

15         So what's the point on that?  There would be no

16   disparity.  But would I feel comfortable suggesting that

17   number?  No, I wouldn't.

18         What I think takes this outside the heartland, and

19   that's a throwback from many years back, right, is the

20   cooperation.  That's what makes it different from any other

21   case, and let's talk about that briefly.  I know you read the

22   5K1 application, but I want to touch on some important things.

23         One, this is not a case where Mr. Cohen sits down at a

24   few proffers and it squeaks through the front office of the

25   U.S. Attorney's Office and they say, let's give him a 5K1

1    letter.  It was substantial assistance in an investigation.  So

2    he gets a lukewarm letter.

3         It's the polar opposite.  For a ten-month period he

4    shuffled all over upstate New York State, four different

5    prisons, being prepared and being available to take the witness

6    stand one day in the Northern District of New York and testify

7    in open court.  He did it.  He testified for a full day and got

8    cross-examined for much of it.

9         In preparation for it, he told the government things

10   they never would have known about him, but he knew, he was

11   responsible.  As Mr. Swett said, he understands, an authentic

12   understanding that, you know, I have a choice.  I'm at a

13   crossroads.  I can either stay left or I can make this right

14   and go right, and he makes it right and he goes right.  He

15   turns the corner and he's on Team USA, which also goes to

16   whether or not a lengthy prison sentence is required for

17   specific deterrence.  In other words, does he get it?  Has he

18   changed?  Is he on a different team now?  Is he on the old

19   Jordan Cohen team or this team?  I think that you can tell a

20   tree by its fruits.  Talk is cheap.  He did it.  He testified.

21        You know what's important about the testimony, your

22   Honor?  We have a defendant upstate, Jakes Johnson, who had

23   been convicted of possession of child porn, didn't learn his

24   lesson the first time.  While on supervised release, he eats

25   three or four more charges and that's not enough.  He doesn't

do what Mr. Cohen did and accept responsibility.  He wants to
go to trial.  Hey, it's everyone's right.  It's not everyone's
right to lie and to put on a fake fraudulent defense, which is
what he did, an insanity defense, a defense where he says, I
didn't possess any child porn, and I was crazy at the time.

We got a phone call from the Northern District.  They
needed Mr. Cohen.  Not just to be some witness, but to be the
witness, the witness, the only lay person.  He, Mr. Cohen, is
responsible for that man's conviction because he thwarted the
fraudulent defense.  That man was not insane and that man very
much did possess child porn.  He tried to say that the reason
he was around child porn was to catch other bad people doing it
and to stop them from doing it.  Mr. Cohen described the man's
demeanor and actions in a third-person's apartment while Jakes
Johnson was viewing child porn, far from someone who was there
just to catch other people, a willing participant.  So
Mr. Cohen is responsible for the conviction, and he got 200
months, Jakes Johnson did.

Now, many people -- let me take it back because it's
not true.  Not many people testify at trial.  Sometimes it
winds up that a cooperator takes the witness stand and
testifies at the trial, sometimes.  But they usually have
cooperation agreements when they do it.  They don't know
whether or not they are going to get the 5K1 letter, although
people have a sense, right, if you're in the business.

1        This man did all this with no assurances.  He didn't

2   even have a cooperation agreement.  We had conversations.  We

3   didn't know he would get anything from it or for it.  What we

4   knew, Mr. Brill and I, is we would be telling you about it

5   certainly, but he would be stuck with a ten year man min.  And

6   your Honor knows that a sentencing proceeding is much different

7   when there is a 5K1 application than when there is some

8   *Rodriguez* application made.  Second Circuit, *U.S. v. Rodriguez*,

9   you can consider as part of someone's history and

10   characteristics whether or not they helped the government.

11   It's a much different day in court, and he knew it.

12        He didn't bat an eyelash before deciding he is going

13   to help Team USA.  He didn't even hesitate.  He did it.  He

14   proffered four times, including the one time he told the

15   government everything about himself.

16        While in one of those four prisons, during those ten

17   months, during a pandemic, one of the prison guards tells on

18   Mr. Cohen on the unit, and he says he is a snitch.  He's a

19   snitch in a child porn case.  He is a child porn possessor who

20   is now a rat.

21        And now for a week Mr. Cohen is not sure whether he is

22   going to be shanked in the middle of the night or what's going

23   to happen to him.  There is not a dull moment for a week, until

24   he is lucky enough to get out of there and get off that unit

25   and out of that prison.

1          In other words, in sum, relative to the 5K1 portion of

2     what I want to say is that it's extraordinary, it's unique, and

3     I would want you to consider that, please, all of it.

4          The second-to-last thing I want to say, your Honor, is

5     that, as we consider the need to avoid disparity in sentences,

6     as I said earlier, you could give a low sentence.  For every

7     low one, there is a high one for sure.

8          But let's look at the one sentence that's connected to

9     this in some way tangentially, which is Jakes Johnson's

10    sentence.  That's a guy who gets 200 months, but he already got

11    convicted of child porn.  He does it again and worse, and he

12    thumbs his nose at the government, the judge, and the jury and

13    goes to trial and lies.  And the way he gets caught is by

14    Jordan.

15         After all of that and violating supervised release,

16    that's 200 months.  So I say 84 months, sufficient but not

17    greater than necessary, and that's part of the analysis.

18         Lastly, before Mr. Brill gives us his thoughts, your

19    Honor, is, yes, general deterrence is important.  I am not

20    going to belabor the point because I know you're aware of the

21    studies.

22         But I'll just say very briefly, it is not the length

23    of the sentence that deters those people.  It is the certainty

24    of the sentence.  I'm not talking about a year and a day.  The

25    84 months that we are requesting, anyone looking at it, should

I engage in this conduct, knowing that this man, if you will
give him that sentence, got 84 months, no one is signing up for
that?

But the analysis goes deeper.  It's not just anyone
watching.  It's people similarly situated.  You've got someone
who is working so hard, he is *magna cum laude*, Northwestern
University.  He is teaching.  He's acting.  His life up until
this abyss, as I call it, was picture perfect with a community
of people who love him.  No one worked harder.  No one did
more.

Everything he did was wonderful in his family because
he licked his wounds and pulled himself up by the boot straps
once he became an adult, and he had a wonderful life.  No one
would trade that in for an 84-month sentence.

I'm sorry I'm yelling.  It's hard with the mask.  It's
disconcerting for me to do this while sitting down.  I
appreciate your patience.

If you would, Mr. Brill would like to address your
Honor.

THE COURT:  Mr. Brill, do you have a microphone
anywhere close to you?

MR. BRILL:  Yes.

How is that, your Honor?

THE COURT:  Much better.

MR. BRILL:  Thank you so much.

1          Your Honor, I wanted to drill down a little more on a

2    few things that Mr. Sapone had touched upon that I think are

3    relevant to give your Honor a better picture of what it's been

4    like for Mr. Cohen since he was arrested, but, perhaps more

5    importantly, where he is going and where we believe he has the

6    potential to go so that your Honor understands that a little

7    better when this Court imposes what it believes to be an

8    appropriate sentence.

9          Mr. Cohen, when he was arrested in early March of

10   2017, was immediately detained.  He has been incarcerated for

11   about 50 months since he was arrested.

12         It's our belief that given what had occurred to him,

13   as Mr. Sapone touched upon, but also issues completely outside

14   of his control, that I'll go into that your Honor is well aware

15   of, those 50 months were effectively more than a normal 50

16   months would be, essentially far outside the normal punitive

17   nature and hardship that exists from incarceration.  Obviously,

18   there is nothing good about incarceration.  It's supposed to be

19   hard and its not supposed to be something that's pleasant or

20   enjoyable for a defendant.

21         But what happened to Mr. Cohen, I think, is important

22   to show that it was extraordinary for Mr. Cohen and harder than

23   what the general idea of sentencing is, the fact that this

24   Court is ready to impose what it believes to be just

25   punishment, just punishment as mandated by 18 U.S.C. 3553.

1    Again, I think it's important to understand that the 50 months

2    that he has already spent incarcerated, I believe, are

3    essentially what should be viewed and worth more in this

4    Court's mind than essentially just the typical 50 months.

5         First of all, as Mr. Sapone had alluded to, Mr. Cohen

6    generally lived in fear for his life almost on a daily basis.

7    He essentially came to the jail with the characteristics that

8    can't be worse.  He is a homosexual and also at some point

9    became a cooperator for the government, two characteristics

10   that are viewed by many defendants that are incarcerated as

11   something very unliked.

12        The fear that Mr. Cohen had for his safety was not

13   just a subconscious fear and something that was not realistic.

14   Mr. Cohen on several occasions was bullied by other inmates,

15   was threatened by other inmates.  We have been told that at

16   least on three occasions in the MDC, he was threatened and

17   robbed by other inmates, called awful names, like fagot, and

18   also told that we know you are touching little kids out there.

19   However it happened, the word was out, what Mr. Cohen was

20   charged with.

21        As Mr. Sapone said, it did lead to protective custody

22   in MDC, which is the SHU that the Court is well aware of.

23   Although it's there to protect the defendants, it is sort of a

24   double-edge sword in that, as a result of that, visitation is

25   curtailed, recreation is curtailed.  You are surrounded by

other inmates who also require that level of custody, not

always because of their protection, but sometimes because of

their behavior.  As a result of that protective custody, he

spent more than a month there in that segregation where he was

deprived of more than what, again, general incarceration calls

for.

It didn't stop when he left New York City, when he

went upstate to testify for the government in the Northern

District.  In Chenango County, which I believe is a state

facility where he was for a time while he was cooperating and

proffering, one of the correction officers outed him again one

week before he left in the year 2020.  It was during that week

that, again, Mr. Cohen, essentially lived in fear.

Again, it hasn't stopped and most recently, your

Honor, within a matter of weeks, we were told by Mr. Cohen

that, again, a correction officer in the MDC has outed him as a

result of his charges and his sexual propensity, and word got

out to MS13 members at the MDC, putting Mr. Cohen at risk.

We were told about it.  We certainly told Mr. Cohen

that we informed the government about it.  We certainly

informed the Court about it, if that's what Mr. Cohen wanted

and if we saw a need to do that.  But it was Mr. Cohen that

felt that sometimes, although the fear was real, the reaction

to the threats and the fear, again, of being sent to

segregation and protective custody, sometimes was effectively

1    worse than just living with the fear and trying to avoid it.  I

2    don't want to act as if being in jail is supposed to be a

3    vacation, but certainly it doesn't seem like it's supposed to

4    be this either.

5            I tell this Court that to give the Court, again, a

6    sense of what he has been through with respect to his

7    characteristics, but also how he will live in the BOP once this

8    Court imposes its sentence.

9            I respectfully ask the Court to keep that in mind when

10   attempting or determining what a just punishment is, knowing

11   what Mr. Cohen will essentially live through.  This will

12   certainly not stop simply because he's a sentenced prisoner.

13           I do just want to bring up the other aspects of his

14   50-month incarceration.  I'll start with the 2019 Polar Vortex

15   event that occurred at the MDC, as your Honor may well

16   remember.

17           During New York City's most cold winter, there was a

18   fire at the MDC that knocked out electricity, where Mr. Cohen

19   was.  As a result, Mr. Cohen and other defendants were left

20   with no heat, no electricity, no showers, no hot food, no

21   necessary psychiatric medication that Mr. Cohen required.

22   Again, on top of just the general fear and threats that

23   Mr. Cohen lived amongst, he was subject to this particular

24   situation in 2019.

25               Again, I am sure the Court is well aware of it, but

1  certainly judges in this district have commented on the

2  disastrous conditions that resulted just from that one week.

3  There are certainly lawsuits that are still pending as a result

4  of that.  Judges again in this district have felt the need to

5  downward vary as a result of that.

6       I'll cite Judge Furman from this district who says:

7  It seems pretty clear to me that -- I'm looking for the case.

8  I believe it's *United States v. Ozols*, which is a 2019 case.

9  It's pretty clear to me that steps could have been taken, and

10 taken more quickly, to address the problems at MDC.  The bottom

11 line is, the conditions that I read about are the conditions

12 that one associates with a third-world country and not a

13 country like this.  And nobody in detention should have to

14 endure that, as the detainees did at the MDC.  That's Judge

15 Furman in 2019.

16      Of course, last but not least, with respect to

17 Mr. Cohen's conditions of incarceration, again, I am not saying

18 anything here that nobody knows in this courtroom, but

19 certainly your Honor knows very well, is that the pandemic of

20 COVID-19 has struck not only us outside of jail, but to such a

21 greater extent for the people inside.

22      I'll just start by generally saying, I am not sure the

23 sentencing commission in their sentencing guidelines could have

24 ever anticipated something like a COVID-19 epidemic where

25 individuals who are incarcerated had to live through.

1          But I think the only way to put it is that the time in

2    prison that Jordan spent since last March of 2020 was brutal.

3    There is no other word to say.  It was brutal for us as

4    civilians who would live on the street outside of jail, within

5    the safety of our homes.

6          One can imagine what it is like when one is

7    incarcerated, with absolutely no freedom to socially distance,

8    to wash their hands, to wear a mask.  You're essentially told

9    what to do, told where to go, and you have no say over whether

10   or not you will be surrounded by someone who will get you sick,

11   and if you get sick, you can die.  That's a very brutal

12   condition and certainly not a condition, I don't think, that

13   any sentencing court or any legal mind would say is proper

14   punishment or proper incarceration.

15         I'll just say that the conditions that Mr. Cohen had

16   to live through, essentially a day in prison that he spent, is

17   not the same amount of punishment as it was prepandemic.  It's

18   far, far worse.  Again, I know I'm not saying anything that the

19   Court doesn't already know.  The Court itself lived through it,

20   just like everybody else.  But I hope it's important --

21   respectfully, I say that -- I hope that it's important when the

22   Court is determining what is just to take into consideration

23   what portion of the 50 months Mr. Cohen had to live through in

24   light of COVID-19.

25         I will end by saying that as a result of being -- this

portion at least, being incarcerated during COVID-19, despite
being locked down 24 hours a day, no visits from his family for
about 15 months, being let out of his cell for a very short
period of time, where he had to shower, where he had to call
his family, where he had to do legal research, whatever he
could do in that amount of time, that's the only time he had.

Despite that, he somehow did come in contact with
someone who was COVID positive, and then he contracted COVID-19
as well.  He describes his symptoms as a sore throat, chest
congestion, hard to breathe.  He tells us that he fainted one
day and, because of the malfunctioning bell, it took longer
than usual for help to arrive.  He also describes that he does
still have some lingering effects as well.

Again, this was basically a living hell for Mr. Cohen
and although incarceration should not be heaven, I am not
sure -- I don't believe, and I say that in tongue and cheek, it
certainly shouldn't be a living well as it was during a
significant portion of Mr. Cohen's 50 months while he was
incarcerated.

It is amazing, though, that despite this hardship and
this adversity that clearly exists, the threats to his life,
the fear that someone will hurt him, contagious diseases,
blackouts, that he made the best of it, nevertheless.

If there is ever evidence for the Court to take into
consideration in deciding, OK, who is this person that I'm

about to sentence, the resiliency, the way that he adapted is

really extraordinary.  What I mean by this is despite its

conditions and despite how he lived in jail, he took it upon

himself to take advantage of whatever he could take advantage

of in the MDC.  He took classes.  But, maybe more importantly,

he taught classes.

         As Mr. Sapone said, and as your Honor knows from

reading the materials, this is someone who is highly educated

and certainly has the ability to convey some of that education

and chose to share that with the other defendants who are

incarcerated.  He gave back to the incarcerated community.

         He tells us that he taught a six-week, a 12-session

course called entrepreneurship.  Each session lasted about two

hours, for a total of 24 hours of class time.  He described

that there were about 12 students in the class, and they

discussed things like incorporating your business, creating a

website, business finance, hiring employees, competition in

allies, marketing, not the kind of thing that you hear from

jail.

         But Mr. Cohen, despite the adversity, took it upon

himself to try to convey the knowledge he had and teach others.

He prepared his lessons.  He told us that he would read

anywhere from 20 to 30 pages of information that his mother

would find for him online and provide it to him.  He would

review the material and then, again, share it with other

1  defendants.

2          He describes the inmates who heard it as responding

3  positively to this and felt as though the class was well

4  integrated and holistic.  He saw the students, i.e.,

5  incarcerated defendants, making connections across classes.  He

6  said, more than one inmate told me that the class was the best

7  they have taken in prison.  You know, there is something to be

8  said for the idea that he has given back to others, but also

9  something to be said for what Jordan Cohen did and the type of

10 person that he is, even under such very unfortunate and

11 difficult circumstances.

12         I would hope again, again hope, respectfully, that the

13 Court balances his conduct here with his conduct after he was

14 charged and, again, along the lines of Mr. Swett's comments, of

15 his attempts to try to get back to some level of normalcy, like

16 teaching classes, learning, and doing what he knows best.

17         The impression I wanted to leave the Court with as

18 well is not only how hard it was then, but perhaps maybe

19 something that's maybe more important to the Court, and I don't

20 mean to be presumption.  But, basically, what it is going to be

21 in the future and what others have seen of Mr. Cohen, whether

22 he is rehabilitated, whether he's on the path to be

23 rehabilitated, and how comfortable can this Court feel about

24 Mr. Cohen's future, because I'm sure that will play a part in

25 the sentence that this Court imposes.

1          To that end I will cite the Court just, again, or

2   emphasize for the Court the letters that we attached to our

3   addendum, our most recent sentencing memorandum.  There were

4   about eight to ten letters here, but I think one theme really

5   shined through and that was their view of Mr. Cohen's remorse

6   and no excuses.

7          Again, from people that know and love him better than

8   any of us know him said consistent things in their letters from

9   what they have observed of Mr. Cohen now, as he has gone

10  through these 50 months of incarceration.  His mother Barbara

11  said, I see in my son shame and very deep remorse.  A family

12  friend of 35 years, Daniella Gold, said, Jordan has constantly

13  expressed remorse for his actions, as well as the hurt he has

14  caused his family, friends, and victims.  His father Kenneth

15  said, Jordan is ashamed of himself and accepts total

16  responsibility with no excuses.  His brother Matthew said, I

17  know that Jordan is very remorseful, what he has done and

18  understands how he contributed to the harm of the vulnerable.

19  He believes he will spend the rest of his life making up for

20  it.

21          Another telling letter was from a longtime friend,

22  Monica Isomora, who says that over phone calls and in-person

23  visits at the MDC, Jordan had repeatedly expressed to me how

24  profoundly he regrets his behavior.  He has realized the events

25  of his life that led him down such a dark path and vows to

1    never go back again.

2           It was highly telling what Ms. Isomora adds for this

3    Court's consideration, which was that we want him -- this is a

4    quote.  We want him to be an active part of our children's

5    lives and know that he will be a wonderful uncle to our two

6    little boys.  That says a lot, given the nature of the charges,

7    and it says a lot of how Ms. Isomora trusts Jordan, but also

8    what she sees in him and the impression that she gets.  Perhaps

9    that's somewhat similar.  I am not saying exact, but somewhat

10   similar to what the government sees in Mr. Cohen as to his

11   metamorphosis from where he started.  So it does speak volumes.

12   Again, we would ask that it is part of your Honor's

13   consideration in sentencing.

14          The last quote I will add, only because, again, his

15   rehabilitation and remorse and what it looks like for the

16   future is so important on a day like today, his stepfather Paul

17   said, I know he carries a huge burden of shame and

18   responsibility for the wrongful things that he did that sent

19   him to prison.  Jordan knows how wrong his actions were.  He

20   knows it can never happen again.

21          Hopefully, these observations and the words that you

22   are about to hear from Jordan himself will give the Court some

23   comfort to know that the person that they are about to sentence

24   feels remorseful and understands that that conduct, as awful as

25   it was, could never happen again.

1          The impressions of rehabilitation and how Mr. Cohen

2     has grown as a person don't stop with the government or his

3     friends and family or even Mr. Sapone's and my observations

4     about our client, but also spill over to Dr. Krueger himself,

5     who is an extremely experienced forensic psychiatrist who has

6     been in this particular aspect of psychiatry and treatment

7     perhaps all of his career.  It stems back maybe to the late

8     '60s, early '70s.  So he has been around and understands this

9     type of behavior and type of conduct.

10          He had seen Mr. Cohen on two occasions and provided to

11    the Court two reports.  But it's his latest report that I think

12    bears the most emphasis in terms of, again, where we go from

13    here and how comfortable can this Court feel about Mr. Cohen

14    and who this Court is sentencing.

15          To Dr. Krueger, after treating and speaking to

16    Mr. Cohen in person, Dr. Krueger says that Mr. Cohen has

17    matured greatly during the time he has been incarcerated.  He

18    has put his prison time to good use.  In Dr. Krueger's opinion,

19    this is a quote, his risk of reoffense is remote and could be

20    safely released to the community under the usual conditions of

21    federal supervision of individuals convicted of sexual crimes,

22    based on several risk-assessment instruments, all

23    corroborative, that Jordan represents a low-risk of recidivism.

24          I do think that there was a quote from Dr. Krueger

25    regarding his conclusion that there is a remote chance of

1  reoffense that really spoke volumes to me and really goes to

2  the heart of perhaps everything we are doing here.  That is

3  that -- this is Dr. Krueger speaking to your Honor's concerns

4  to alleviate any concerns that Mr. Cohen will reoffend once he

5  is released.  Obviously, this Court, part of its role, is to

6  protect society and how important that is.

7       But Dr. Krueger opines on that, understanding how

8  important that is, and says that lengthy prison sentences --

9  this is Dr. Krueger's words -- lengthy prison sentences would

10 not lessen a defendant's potential to reoffend.  The most

11 effective way, even that low of a risk of recidivism, as he

12 describes Mr. Cohen's risk, is through intensive treatment.

13 That's how we would like to, or I would like to wrap up in

14 terms of his treatment and our plan moving forward.  Perhaps,

15 this also ties into how he can specifically deter someone like

16 Jordan from never engaging in this conduct again.

17      First of all, I do want to just add, if I could,

18 something that may be incredibly obvious and maybe the Court

19 has read a thousand times in its career.  But I will confess,

20 in my long career as well, and many sentences, I didn't

21 necessarily pay as much attention to special conditions from

22 supervised release as I would about ultimately what my client's

23 sentence would be.  Certainly I was aware of special

24 conditions, but never understood how effective they can be and

25 how important they are, but also how it could act as somewhat

1     of a substitute in some situations for additional jail.

2          As Mr. Sapone had highlighted early in the hearing,

3     your Honor must sentence Mr. Cohen to at least five years of

4     supervised release and has the flexibility and the latitude to

5     sentence Mr. Cohen up to life of supervised release.  I believe

6     we recommended ten years, which is very, very lengthy, but

7     obviously the Court has the latitude to do what it feels

8     necessary to do.

9          My point was that the special conditions that are

10    built into the PSR that we asked the Court to incorporate in

11    its sentence are essentially built into prevent recidivism and

12    keep society safe.  Again, I respectfully implore the Court

13    that if the Court is concerned about that, which, of course, it

14    is, that supervised release could alleviate that concern to

15    some extent, and even maybe to a larger extent than I was ever

16    aware of until I read it extremely closely.

17         For example, the special conditions are that Jordan

18    will participate in outpatient treatment programs.  So,

19    obviously, any drugs or alcohol that could affect Mr. Cohen's

20    judgment will be dealt with.

21         In addition to that, the defendant shall undergo a

22    sex-offense-specific evaluation and participate in an

23    outpatient sex-offender treatment.  The defendant shall abide

24    by all rules, requirements, conditions of that sex-offender

25    treatment.  There is going to be, again, a mandate that he not

1  only gets drug and alcohol help, but also goes to a sex-offense

2  program as well, which I will specifically discuss with the

3  Court with respect to our life plan.

4          The defendant must not have deliberate contact with

5  any child under 18 years of age unless approved by the U.S.

6  Probation Office.  The defendant must not loiter within 100

7  feet of places regularly frequented by children under the age

8  of 18, such as schoolyards and playgrounds and arcades.  There

9  is real strict supervision where Mr. Cohen goes and what he

10  does.  Essentially, it's akin to incarceration.  I understand

11  it's not the same thing, but it certainly is the next best

12  thing when trying to alleviate any concern this Court may have

13  had that he reoffends and harms the community.

14          The defendant must inform the U.S. Probation officer

15  prior to accessing any websites within the following

16  categories, and it gives all sorts of websites; not only adult,

17  legal websites, but also other types of social media.  The

18  defendant will not access websites, chat rooms, instant

19  messages or social networking where defendant's criminal

20  history, including this conviction, would render such access in

21  violation of the terms of service of that website, chat room,

22  instant messaging, social networking.

23          Lastly, I thought the special condition that he

24  obviously shall submit his person and any property, residence,

25  vehicle, papers, computer, and electronic communication

1   completely to the probation officer.  The probation officer

2   does not have to seek a warrant before they go ahead and do

3   that.  If there is any indication that they need to do it, if

4   they want to surprise Jordan to do it, they certainly have the

5   option to do that.

6        Again, those are real conditions that should hopefully

7   give this Court some concern that it protects society from any

8   potential that Mr. Cohen has to reoffend, even though

9   Dr. Krueger says that his potential to reoffend is remote.

10       Lastly, with respect to your release plan, I will tell

11  the Court this, and this is something that we believe strongly

12  will happen.  Many people in this courtroom are part of this

13  life plan, so they are here showing their commitment to Jordan

14  and also his future.

15       The first thing is that Jordan intends to move back

16  home to live with his mother and stepfather in Yardley,

17  Pennsylvania.  They have been stable members of that community

18  for a very long time, perhaps since Jordan was born.  They are

19  financially stable and they are Jordan's most ardent

20  supporters.  He is going back home to perhaps the best place

21  that he can go to.

22       Mr. Sapone established a very rocky childhood and a

23  very rough road of it.  But, obviously, major shifts have

24  occurred and the corner may have been turned.  Especially in

25  something as awful as this, there is some bright spot that has

1    brought them closer together.

2          He plans to finish his Ph.D. that he was in the

3    process of doing, but obviously, because of his own choices, it

4    got sidetracked.  He was a hard-working student, as your Honor

5    has read.  Hours of study, hours of student teaching.

6          And in the courtroom now, again, is his professor from

7    CUNY, I believe, Mr. James Wilson, who has told us, and I've

8    written to the Court about it, that he will assist Jordan in

9    getting his dissertation finished.  He will help him with

10   research.  It could be done remotely if we are still in the

11   process of COVID-19 restrictions.  Or if probation requires

12   Mr. Cohen to be at home.

13          I went into detail for the Court about the

14   dissertation, so I was just not glossing it over for the Court

15   to say, yeah, he is going to go back to school, which is easy

16   to say, but we went into detail where he proposes that for one

17   semester he conducts research for the dissertation six to eight

18   hours per day.  We expect that the dissertation will be

19   completed if he works full time in one year and part time in

20   two years.

21          We told Jordan, and Jordan agrees wholeheartedly to

22   pursue some type of employment.  He had mentioned the nonprofit

23   world appeals to him.  There is obviously an impediment to

24   certain jobs, so I don't want to ignore that reality.  But

25   certainly to the extent that Mr. Cohen can find work somewhere,

 1    despite his record, that's what he will do.  He says he would

 2    love a job in academia, assuming that comes to pass.

 3         Mental health treatment.  Obviously, a hugely

 4    important portion of his release plan and his future.  He is on

 5    medication in BOP.  Not the greatest capabilities there in

 6    terms of therapy.  Certainly not during COVID, which is, again,

 7    one of the fallouts of COVID, being incarcerated during these

 8    past 15 months.

 9         But Dr. Krueger and his wife, Meg Kaplan, run a

10    particular program that has been in business for a very long

11    time here in New York City in conjunction with Columbia

12    University, which is the Krueger and Kaplan program for the

13    evaluation and treatment of individuals who have paraphilias,

14    are hypersexual, or perpetrators of sexual crime.  That's the

15    title of their program.  Federal probation that your Honor has

16    sentenced hundreds, thousands of defendants on have utilized

17    this program for other probationers.  Judges in this district

18    accept that program as sound.  And Dr. Krueger tells us that it

19    can be done remotely as well.

20         On top of the group therapy and something as organized

21    as Dr. Krueger, we have contacted a therapist named Mark

22    Williams, who is a social worker and a mental health counselor,

23    also works for the CJA panel, so we have done work with him on

24    other cases.  He has a willingness to work with Jordan and will

25    do it also remotely as well, so that will be part of our

1    release plan.

2           This is all to say, your Honor, that the concerns that

3    the Court has, rightfully so, as to what happens when everybody

4    leaves this courtroom and Mr. Cohen is sentenced and will one

5    day be released, I hope that I have left the Court with the

6    impression and the comfort that there is real supervision here.

7    Certainly from the part of probation, but also from the part of

8    the specific life plan that Mr. Cohen, with our help, has put

9    together.

10          Then, on top of all that, again, if I may say, there

11   is real promise here, real dedication here, real commitment

12   here, and hope for a better life and better judgment and better

13   behavior.

14          All those things are good things, and, again, we

15   believe that we can get there with this sentence that we

16   respectfully recommended the Court impose.

17          THE COURT:  Let's take a short break for the court

18   reporter.

19          (Recess)

20          THE COURT:  Does the government have anything else to

21   say and can the government tell me what's going on with respect

22   to restitution in this case?

23          MR. SWETT:  I have nothing more to add as far as the

24   sentencing presentation, but we are going to be submitting what

25   I hope and expect will be a consent order of restitution.

1          There are several individuals who were depicted in

2     images that were recovered from Mr. Cohen's devices, and we

3     have discussed this with defense counsel and hope to have a

4     consent restitution order for the Court's consideration in the

5     next few days.

6          THE COURT:  Just out of idle curiosity, this case has

7     been around for four years.  Is there some reason why this

8     could not have been done before the sentencing, why I have to

9     leave this open?

10          MR. SWETT:  Frankly, your Honor, no.  It was something

11     that we had discussed at a prior period before the sentencing

12     was adjourned, and in the run up to this I did not get it done.

13     I apologize, but I will get it done first thing.

14          THE COURT:  Thank you.

15          Mr. Cohen, is there anything you want to say to me

16     before I sentence you?

17          THE DEFENDANT:  Yes, your Honor.

18          Your Honor, Judge McMahon, thank you for this

19     opportunity to address you today.

20          I sit here right now with profound regret and remorse

21     for the crimes that I committed.  My actions are inexcusable.

22     While I did not fully appreciate the harm that I was causing at

23     the time, I know now that my actions directly contributed to

24     the pain and victimization suffered by the children involved.

25     I wish more than anything else that I could undo the hurt that

1    I caused them.

2         I want to apologize, first and foremost, to the

3    children in those videos and images, children that I further

4    abused and further victimized through my actions, and really

5    I'd like to apologize to all children of sexual -- all victims

6    of child sexual abuse because my actions only helped to further

7    the disgusting industry of child pornography.  I am deeply,

8    deeply sorry, and I'm deeply, deeply ashamed and would do

9    anything to take back what I did.

10        I apologize to you, your Honor, both as my judge and

11   as a representative of the United States for the ways that I

12   have failed as a citizen.  I acted with utter disregard for the

13   consequences to others from my actions.

14        Looking back at the person I was then, I'm appalled.

15   I believe in my bones that all citizens of both this country

16   and of this earth bear a vital responsibility to protect and

17   foster each other's well-being.  I selfishly betrayed that

18   responsibility.  For that I will never forgive myself, and I

19   promise that I will never be betray it again.

20        I take full and absolute responsibility for my crimes,

21   both possessing child pornography and the attempted enticement

22   of a minor, crimes that I chose to commit.  I promise you

23   today, and I promise my family, and I promise my friends, and I

24   promise Mr. Swett as well, that I will never, ever do it again.

25             I entered jail at 31 years old, but I felt more like

1   21.  Now I'm 35, but I feel more like 50.  I'm a completely

2   different person now than I was then.  I have grown, and I've

3   learned more about myself these four years than during any

4   other period of my life, through therapy with my mitigator,

5   Dr. Simone Gordon.  I confronted many difficult aspects of my

6   own past and learned how to channel the hurt and pain of those

7   experiences into healthy outlets.  I have developed a much

8   stronger sense of empathy but -- excuse me -- both by learning

9   about the effects my actions had on the victims in this case

10  and through listening to the stories of many inmates with whom

11  I have been incarcerated the past four years.

12          Finally, I have watched from jail as my brother and

13  close friends have had children themselves.  As an uncle, I

14  can't imagine doing anything to ever again hurt a child,

15  neither my nieces, my nephews, nor any child deserves to go

16  through the pain and torture of sexual abuse.  The thought of

17  sexual abuse of anyone, especially a child, has come to disgust

18  me and to repel me, certainly as I have come to terms to my own

19  life story.  I'm so sorry.

20          I want to speak for a few moments about how I can

21  assure you that I will never offend again.  In jail I have

22  developed healthy habits that have helped alleviate my

23  depression and anxiety, such as daily exercise, healthy eating,

24  and meditation.  They sound kind of small, but they have

25  actually been enormous accomplishments for me.  I have become a

more confident and centered person.  I have become a resilient

and strong person, especially as I have had to deal with some

difficult times at MDC.

I have done very difficult emotional work with

therapists, and on my own using self-care works and therapy

workbooks, and now I have a much stronger grasp of what my

mental health issues are, how they arose and, most importantly,

how to treat them.

There will be difficult moments ahead, of course, but

I know that with the insight I have gained into myself and the

tools and support I will have upon my release that I am

prepared to make healthy and productive choices and to avoid

falling back into the pits of despair that contributed to my

offenses.

I have overcome the distrust that I had of therapy

that I developed with my experience from conversion therapy

when I was 16 and 17 years old.  I have learned that there are

therapists who I can trust who won't judge me and who can help

me become the best version of myself.  I have learned that I

can trust my family and my friends for help when I need it,

that I do not need to shoulder all of my burdens on my own.

There are no more secrets from them.  This means that

I am fully liberated to reach to them when I have to.  I am not

only accountable to myself and to you, but also to these family

and these friends that have stuck by me.  I will never, ever

1   let them down again because I owe them everything.

2       Ultimately, your Honor, my most fundamental promise to

3   you today is my commitment for the rest of my life to recovery.

4   Recovery for me will be lifelong.  I look forward to recovery.

5   I look forward to continuing to learn about myself, to

6   maintaining a healthy and positive lifestyle, to living a life

7   shaped by the pursuit of meaning rather than the pursuit of

8   fleeting moments of happiness.

9       I look forward to using my skills and my privilege to

10  help others who need help, whether through a career or through

11  volunteering my time, and I look forward to forming healthy and

12  lasting friendships and relationships.  This is what recovery

13  will look like for me, all of this, and a whole lot more, too.

14      I know now that my life is worth living and that I

15  have so much that I can contribute.  It's the people, the

16  people in my life that have helped me to reach that realization

17  over the past four years, and I hope, going forward, I hope

18  that I can be that person for somebody else.  I have a lot of

19  hard work still to do, but I know that I am ready to put in

20  that work, and I never again, never again will do anything to

21  jeopardize my freedom or the trust that others have placed in

22  me.

23      Thank you for listening.

24      THE COURT:  The Court has reviewed the presentence

25  report.  I accept and adopt as my findings its description of

1    the offense and the offense conduct as calculation of the

2    guidelines.  The total offense level, taking into account the

3    two separate crimes to which he has pled guilty, is 37.  The

4    defendant has no criminal history.  Therefore, he is in

5    criminal history category I.  I accept and adopt as my findings

6    the offender characteristics beginning at paragraph 59 of the

7    presentence report.

8         I'm granting the government's motion to sentence the

9    defendant in accordance with Section 3553(e) of Title 18 of the

10   United States Code, in light of the factors set forth in

11   Sections 5K1.1(a)(1) through (5) of the United States

12   Sentencing Guidelines.

13        So the question then becomes, what is the appropriate

14   sentence for the defendant?  Taking into account the fact of

15   his significant cooperation offered under unusual and unusually

16   dangerous and stressful circumstances and without any promise

17   of reward.

18        I will start with what I would have sentenced the

19   defendant to if there hadn't been a 5K motion, and the answer

20   is ten years.  I would have given him the mandatory minimum for

21   Count One, the reason being that it was a sting.

22        If there had been a real father and a real child

23   involved, we would not have been looking at any mandatory

24   minimum.  But it was a sting operation and a mandatory minimum

25   would, in my view, have been sufficient but not greater than

1   necessary to punish the defendant for that crime, and he would

2   have done ten years concurrent on the possession charge.

3          So, that being the case, the sentence that's proposed

4   by defense counsel is probably about where I would come out on

5   my own.  I don't want you to think that that was not a

6   tremendously effective presentation, but it reflects, A, the

7   fact that the defendant has already done 50 months; B, the fact

8   that this is an extraordinarily serious and heinous crime; and,

9   C, that the defendant's cooperation should be worth something.

10  That has been the principal motivating factor in my sentencing,

11  my decision on how to sentence the defendant, having considered

12  all the Section 3553(a) sentencing factors.

13         Would you please stand, Mr. Cohen.

14         Under docket No. 17 CR 289, total offense level of 37,

15  criminal history category I, this is a downward departure for

16  substantial cooperation.

17         I hereby sentence you on Count One to be remanded to

18  the custody of the Attorney General of the United States to the

19  Bureau of Prisons for a term of 84 months and to a concurrent

20  term of 84 months on Count Four.  I'm sentencing you on both

21  counts, now that I have gotten educated by defense counsel on

22  the appropriate levels of supervised release here, to a term of

23  seven years' supervised release which we will talk about in

24  great detail in a moment.  You will hear a lot of things that

25  Mr. Brill already read into the record.

1           I am not imposing a fine on the defendant, given the

2   other financial penalties that he is going to incur.  $200 in

3   special assessments, $10,000 in JVTA assessments, and you will

4   be required to make restitution.  The Court has 90 days to

5   enter an order of restitution identifying your victims and the

6   amounts if the consent order of restitution is proposed.  I

7   will enter that if not.  We will come back and we will figure

8   out how much restitution is supposed to be awarded and to whom.

9           Is the government pursuing forfeiture?

10          MR. SWETT:  No, your Honor.

11          THE COURT:  Thank you.

12          Mr. Sapone, Mr. Brill, place of incarceration?

13          MR. SAPONE:  May I have a moment, your Honor?

14          THE COURT:  Yes.

15          MR. SAPONE:  Your Honor, the request is that -- and I

16  think the BOP knows how to get it right, we need to have him as

17  close to the family as possible where there is availability for

18  treatment.  They know how to do that, depending on bed space

19  and availability.

20          THE COURT:  First of all, I am not the Bureau of

21  Prisons.  As you read in the press, I have absolutely no

22  control over the Bureau of Prisons and very little suasion with

23  the Bureau of Prisons.

24          But I will recommend that you be incarcerated in a

25  facility that can provide you with sex-offender treatment.  If

1    the Bureau of Prisons has a choice among such facilities, the

2    one that is the closest to your family, who live in and around

3    the area of Yardley, Pennsylvania, and thereabouts, so that

4    family visitation, which I believe has sustained this defendant

5    through the last four years, and I thank his parents for that,

6    can continue.

7            That's the imprisonment part.  Let me turn to the

8    supervised release part because what's going to happen when you

9    are done with your sentence, and you are not done yet, but when

10   you are done with your incarcerative sentence, you get to begin

11   act two.  Act two is called supervised release.  For a period

12   of seven years you will report on a regular basis to a United

13   States probation officer.

14           It is my recommendation that the defendant be

15   supervised in his district of residence, although I will not

16   turn the case over to a judge in the Eastern District of

17   Pennsylvania.  I will retain supervision over the case.

18           You will report to the probation officer on a regular

19   basis.  The basic rule is simple.  You do everything the

20   probation officer tells you to do, and you do nothing the

21   probation officer tells you that you cannot do.  That's the

22   basic rule.

23           There are certain statutorily mandated conditions of

24   supervision.  You will violate your supervised release if you

25   commit another crime, federal, state, local.  Felony.

Misdemeanor.  Don't run a stop sign.  You must not unlawfully

possess a controlled substance.  You must participate in an

outpatient treatment program approved by the United States

Probation Office which program will include testing to

determine whether you have reverted to using controlled

substances illicitly.

You must contribute to the cost of services rendered

based on your ability to pay or the availability of insurance

to cover payment, third-party payment.  I authorize the release

of available drug treatment evaluations and reports, including

the presentence investigation report to the substance abuse

treatment provider.

You must cooperate in the collection of DNA as

directed by your probation officer.  You must comply with the

requirements of the Sex Offender Registration and Notification

Act as directed by your probation officer, the Bureau of

Prisons, or any state sex offender registration agency in which

you reside, work, are a student, or were convicted of a

qualifying offense.  Obviously, if you are going to be living

in Yardley, Pennsylvania, that will include the Commonwealth of

Pennsylvania.  If you are attending City College, that will

include the State of New York.  The probation office is on top

of these things and will help you through that, but you must do

all of the sex-offender registration that you need to do.

There are standard conditions of supervision with

1    which you must comply.  You have 72 hours following your

2    release to report to the probation office in the district where

3    you are authorized to reside.  That's the Eastern District of

4    Pennsylvania.  After reporting to the probation office, you

5    will receive instructions about what rules to follow.

6          You must not knowingly leave the judicial district

7    where you are authorized to reside without getting permission

8    from the Court or your probation officer.  You must answer

9    truthfully the questions put to you by your probation officer.

10   You must live at a place approved by your probation officer.

11   If you plan to change where you live or anything about your

12   living arrangements, including who you live with, you must

13   notify your probation officer at least ten days before making

14   that change.  If notifying the probation officer in advance is

15   not possible because the reason you have to leave is the house

16   burnt down, you have 72 hours to call your probation officer

17   and explain the circumstances and where you can be found.

18         You must allow your probation officer to visit you at

19   any time in your home or elsewhere, and you must permit the

20   probation officer to take any items that are prohibited by the

21   conditions of your supervision that are observed in plain view.

22         You must work full time, at least 30 hours a week, at

23   a lawful type of employment unless the probation officer

24   excuses you from doing so.  If you don't have full-time

25   employment, you must try to find it, unless the probation

 1   officer excuses you from doing so.

 2          If the probation office concludes that you should

 3   engage in education, that can be a substitute for a certain

 4   number of hours of work or possibly full-time work.  You're

 5   ADD.  I hope you can get your dissertation done.

 6          If you plan to change where you work or anything about

 7   your work, such as your position or your job responsibilities,

 8   you have to notify the probation officer at least ten days

 9   before making that change.  If notifying the probation officer

10   at least ten days in advance is impossible, the place where you

11   work, the boss closes up, suddenly there is no work, you have

12   72 hours to notify your probation officer once you become aware

13   of any change.

14          You must not communicate or interact with anyone who

15   you know is engaged in criminal activity.  I remind you that

16   the things of which you stand convicted of are criminal

17   activity, so you better not be communicating with anybody who

18   is doing those sorts of things.

19          If you know someone who has been convicted of a

20   felony, you must not knowingly communicate or interact with

21   that person without first getting the permission of your

22   probation officer.  If you are arrested or even just questioned

23   by law enforcement, you have to notify your probation officer

24   within 72 hours.  You must not own, possess, or have access to

25   a firearm, ammunition, destructive device, or dangerous weapon

of any sort.  I emphasize the words have access to.  If you're

in a home where there are firearms that are lawfully possessed

by others, they better be locked in a place where you don't

have a key.

        You must not act or make any agreement with a law

enforcement agency to act as a confidential human source or

informant without first getting the permission of the Court.

If the probation officer determines that you pose a risk to

another person or organization, the probation officer may

require you to notify that person or organization about the

risk, and you must comply with that instruction, knowing that

the probation officer may contact the person or organizations

to confirm that you have obeyed.

        Now, Mr. Brill went on at great length about the

special conditions of supervision.  They are not imposed on

everyone.  They are being imposed on you.  They are indeed

special because of their pertinence to your particular

situation.  One of them is that outpatient drug treatment.

        The second is that you shall undergo a

sex-offense-specific evaluation and participate in an

outpatient sex-offender treatment and/or an outpatient mental

health treatment program approved by your probation officer.

        You will abide by all the rules, requirements, and

conditions of the sex-offender treatment programs, including

submission to polygraph testing and refraining from accessing

websites, chat rooms, instant messaging, or social networking

sites, to the extent that the sex-offender treatment program

determines that such access would be detrimental to your

ongoing treatment.  You will not view, access, possess and/or

download any pornography involving adults unless your

sex-offender treatment provider says you can do that.

You must waive your right of confidentiality in any

records for mental health assessment and treatment imposed as a

consequence of this judgment to allow the United States

Probation Office to review the course of treatment and your

progress with your treatment provider.  Again, you must

contribute to the cost of services rendered based on your

ability to pay or the availability of third-party payment, and

I authorize the release of available psychological and

psychiatric evaluations and reports, including the presentence

investigation report to the sex-offender treatment provider

and/or mental health treatment provider.

You are restricted from viewing, accessing, possessing

and/or downloading any sexually explicit material involving

minors, including material that's created via the method of

morphing or other image-creation format.  You will not view or

possess any visual depiction, as defined in 18, United States

Code, Section 2256, including any photographs, film, video,

picture or computer-generated image or picture, whether made or

produced by electronic, mechanical, or other means, of sexually

1     explicit conduct by a minor under the age of 18.  In other

2     words, you don't get out from under just because it's a

3     computer-generated image, as opposed to a real child.

4           You must not have deliberate contact with any child

5     under the age of 18 unless it has been approved by your

6     probation officer.  This goes for your brother's children.

7     This goes for your friends' children.  Your friend wants you to

8     be an uncle.  All of that has to be cleared with probation.

9           You must not loiter within 100 feet of places

10    regularly frequented by children under the age of 18, such as

11    schoolyards, playgrounds, or arcades.  You must not view and/or

12    access any web profile of users under the age of 18, including,

13    but not limited to, on social networking websites, community

14    portals, chat rooms, or other online-environment audio, visual,

15    or messaging which allows for real-time interaction with other

16    users without prior approval from your probation officer.

17          You will inform the United States Probation Office

18    prior to accessing any websites within the following

19    categories:  Adult, alternative lifestyles, chat and social

20    networks, dating and personals, download media, downloads, free

21    hosting, kids and teens, web mail and XXX.  You have to get

22    permission prior to accessing those for the first time, and you

23    will not access any such website unless such access is approved

24    by the probation officer.  The probation office must approve

25    within three business days any such access unless the volume of

1    that request makes it impractical, in which case probation may

2    seek the Court's approval for more time.

3         The defendant will not access any websites, chat

4    rooms, instant messaging or social networking sites where your

5    criminal history, including this conviction, would render such

6    access a violation of the terms of service of that website,

7    chat room, instant messaging, or social networking site.

8         Eventually we are going to have an order of

9    restitution in this case, and I believe there will be victims

10   who will be identified as part of that.  You must not have

11   contact with any of the victims in this case.  This includes

12   any physical, visual, written, or telephone contact with such

13   person, and you must not directly cause or encourage anyone

14   else to have contact of any sort with the victims.  This is not

15   to happen.  I don't care how much you want to say I'm sorry.

16   It's not to happen.

17        You shall submit your person and any property,

18   residence, vehicle, papers, computer, other electronic

19   communication or data storage devices or media and your

20   personal effects to a search at any time, with or without a

21   warrant.  Basically, I'm signing the warrant right now today by

22   any law enforcement or probation officer who has reasonable

23   suspicion that you have violated a condition of your supervised

24   release or engaged in any unlawful conduct.

25        That's a lot of conditions.  They are actually rather

onerous, especially insofar as your online life is concerned.
That is appropriate in this case and that will last for seven
years.

At the end of seven years of incarceration and seven
years of supervised release, if nothing bad has happened, if
nothing untoward has happened, then I am comfortable that what
Mr. Swett so ardently hopes will indeed be the case.  You will
have turned your life around and have made yourself into a
valuable contributing citizen.

I hope you are able to complete your degree.  I hope
that you are able to find work that you find satisfying.  You
are going to have to find work, whether you find it satisfying
or not.  Certainly some types of work that you would previously
have found satisfying will be off limits to you.  You know
that.  I know that.  We are not going to pretend that that is
not the case.  But it does seem to me that you have a great
deal to contribute.

Was there an appeal waiver, Mr. Swett?

MR. SWETT:  Yes, your Honor.

THE COURT:  Was that 262 months?

MR. SWETT:  Yes, your Honor.

THE COURT:  Mr. Cohen, do you recall that at the time
you entered your plea of guilty, you also signed a letter of
agreement with the government?

THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  In that letter it said that if the judge

2    sentenced you to 262 months in prison or less, you would not

3    take an appeal from your sentence or bring a lawsuit

4    challenging the legality of your sentence.

5          Do you recall that?

6          THE DEFENDANT:  Yes, ma'am.

7          THE COURT:  Did you talk to your lawyers about that

8    before you signed the letter?

9          THE DEFENDANT:  Yes, I did.

10         THE COURT:  Did they explain to you that you would be

11   giving up a right you would otherwise have to take an appeal

12   from your sentence as long as it wasn't more than 262 months?

13         THE DEFENDANT:  Yes, your Honor.

14         THE COURT:  I have sentenced you to 84 months.  You

15   are a very intelligent man.  You can do the math.  It's less

16   than 262 months by a rather substantial amount.  So it's my

17   understanding that you have waived your right to take an appeal

18   from your sentence.  Is that your understanding?

19         THE DEFENDANT:  Yes, ma'am.

20         THE COURT:  Can you assure me that you signed that

21   letter of your own free will?

22         THE DEFENDANT:  Yes, your Honor.

23         THE COURT:  Have a seat.

24         Mr. Swett, is there anything else from the government?

25         MR. SWETT:  Yes, your Honor.  The government moves to

1   dismiss open counts and underlying indictments.

2          THE COURT:  The open counts if underlying indictments

3   are dismissed.

4          Mr. Sapone.

5          MR. SAPONE:  Thank you very much, your Honor.

6          THE COURT:  Mr. Brill, anything?

7          MR. BRILL:  No.  Thank you.

8          THE COURT:  The best of luck to you, sir.

9          These proceedings are closed.

10          (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25